**325–343 E. 56TH STREET CORPORATION,**
Plaintiff,

v.

**MOBIL OIL CORPORATION,**
**et. al., Defendants.**

**No. 93–0297 RMU.**

United States District Court,
District of Columbia.

Oct. 19, 1995.

Robert X. Perry, Jr., Wilkes, Artis, Hedrick & Lane, Kim Hoyt Sperduto, Sperduto Law Firm, Washington, DC, for Plaintiff.

William A. Caldwell, Washington Metropolitan Area Transit A., Office of General

Counsel, John Jay Range, Michael Patrick McQuillen, Richard F. Gibbons, Jr., Hunton & Williams, Darci Lee Rock, Richard D. Horn, Bracewell & Patterson, Washington, DC, for Defendants.

## AMENDED MEMORANDUM OPINION[1]

URBINA, District Judge.

## I. CASE HISTORY

On January 19, 1993, Plaintiff, 325–343 E. 56th Street, Fifty–Fifty Corporation, on behalf of The Corps Limited Partnership (hereinafter "The Corps"), filed a complaint against Mobil Oil Corporation (hereinafter "Mobil"), Atlantic Richfield Company (hereinafter "ARCO"), and the Washington Metropolitan Area Transit Authority (hereinafter "WMATA") in the Superior Court for the District of Columbia. Defendant WMATA removed the case to this court pursuant to D.C.Code Ann. § 1–2431 (1992).

The Complaint is based on nine counts for: (1) strict liability; (2) trespass; (3) common law indemnification; (4) negligence; (5) violation of the District of Columbia Underground Storage Tank Act; (6) negligence *per se* for violation of the District of Columbia Underground Storage Tank Act; (7) restitution; (8) negligence *per se* for violations of 40 C.F.R. §§ 280–81; and (9) contractual indemnification. Plaintiff has moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). Defendant ARCO has moved for dismissal of the Plaintiff's Complaint pursuant to Fed. R.Civ.P. 12(b)(6). Defendant WMATA has filed a cross-motion for summary judgment.

## II. BACKGROUND

### A. The Defendants

From 1985 through October of 1992, the Corps owned a piece of property (hereinafter "the property"), the subject of this lawsuit, located at the corner of 12th Street, H Street, and New York Avenue in Northwest Washington, D.C.

Defendant Mobil is the successor-in-interest to Socony Mobil Company, Inc., which leased the property from 1962 through 1974.

Defendant ARCO is the successor-in-interest of Sinclair Refining Company (hereinafter "Sinclair") which leased the property from 1946 through 1949.

Defendant WMATA, an instrumentality and agency of the governments of the District of Columbia, the State of Maryland, and the Commonwealth of Virginia, owned the property from 1974 to 1981.

### B. Ownership and Alleged Usage of the Property

On or about March 20, 1946, Riva Honig leased the property to Sinclair for a period of three years beginning on April 8, 1946. Sinclair operated or permitted others to operate a gasoline service station which sold and dispensed petroleum products on the property. Underground storage tanks, (hereinafter "USTs"), supply lines, and pumps were installed on the property.

In October of 1949, Helen Wright acquired the property from Riva Honig. On or about March 8, 1962, Wright leased the property to Mobil for a term of fifteen years. Mobil's lease provided, in part, for indemnification against all claims, demands, and liabilities based on damages or injuries to property occasioned by Mobil's negligence in the conduct and operation of its business on the property.

From 1962 until 1974, Mobil operated and/or permitted others to operate gasoline service stations, which sold and dispensed petroleum products on the property. Mobil built an entirely new gasoline and service station on the property in 1963. It installed four four-thousand (4000) gallon tanks to serve the new station. Upon termination of the Mobil Lease, Mobil neither slurried nor removed any USTs or pumps.

On or about July 26, 1974, WMATA acquired the property in eminent domain proceedings. WMATA leased the premises to

---

1. The original opinion is amended to include the following proviso: Mobil settled with Plaintiff immediately prior to the issuance of this opinion. Therefore, the applicability of this opinion is limited to the non-settling defendants. Any included reference to Mobil has remained for purposes of clarity.

Eugene E. Beavers (hereinafter "Beavers") from July 27, 1974 to October 10, 1974. Beavers operated a gasoline service station on the property during this lease period, and paid WMATA rents for use of the property. Mobil and WMATA were the last entities that leased or owned the property for purposes of operating a gasoline service station.

Thereafter, WMATA hired Ace Wrecking & Building Material Company (hereinafter "Ace") to, *inter alia,* remove the USTs and demolish the pumps on the property. Ace purportedly removed certain USTs, demolished the pumps, and backfilled the excavation site with sand.

On or about February 26, 1981, WMATA conveyed the property in fee simple, subject to WMATA's subsurface easement and right of way, to James, Theodore, and Evangeline Pedas. No gasoline service station or related services operated on the property during the Pedases' ownership.

On or about December 31, 1983, the property was conveyed by the Pedases to the Cafritz Construction Company, the Morris and Gwendalyn Cafritz Foundation, Riggs National Bank, Gwendalyn D. Cafritz, Calvin Cafritz, and Martin Atlas (collectively, "Cafritz"). No gasoline service station or related services operated on the property during the Cafritz's ownership.

The Corps acquired the property from Crafritz in 1985. No gasoline service station or related services operated on the property during the Corps' ownership. On or about November 13, 1989, Chase Manhattan Bank, in conjunction with a mortgage placed on the property, required the performance of an environmental study. Briggs Associates, Inc. (hereinafter "Briggs") was engaged to perform the study, the culmination of which was a report. The study was undertaken to determine if a release of petroleum products or hazardous materials had occurred on the property.

According to the Briggs Report, Briggs visually inspected the property for contamination, performed a site history investigation, and collected soil samples for testing. The Briggs Report concluded that the USTs had been removed and that there had been no releases of any hazardous or toxic substances, including petroleum, on the property.

On or about July 30, 1992, the Corps entered into a purchase contract with the American Association for the Advancement of Science (hereinafter "AAAS") for sale of the property. On October 9, 1992, the property was sold by the Corps to AAAS. The Purchase Contract entitled AAAS to perform a feasibility study on the property prior to sale.

In August of 1992, Schnabel Engineering Associates, Inc. (hereinafter "SCS") performed a feasibility study on behalf of AAAS. The study included geo-technical and environmental tests on the property. SCS's study revealed that petroleum and petroleum substances contaminated the property. The Corps then retained SCS, which confirmed that the soil on the property was contaminated. On behalf of the Corps, SCS notified District of Columbia Department of Consumer and Regulatory Affairs (hereinafter "DCRA") of the petroleum contamination on the property. DCRA directed the Corps to remediate the property.

On September 2, 1992, the Corps through SCS commenced remediation. SCS discovered six USTs on the property, specifically, four two-thousand-five-hundred (2500) gallon gasoline USTs partially filled with sludge, one five-hundred-and-fifty (550) gallon waste oil UST partially filled with sludge, and one one-thousand (1000) gallon gasoline UST containing waste oil sludge. Additionally, one concrete oil/water separator, which contained approximately three-hundred (300) gallons of waste oil sludge, was discovered. All six USTs and the separator were corroded and contained cracks and holes. SCS also discovered two sets of underground supply or transfer lines, along with connected piping, lines, and fittings on the property. Residual petroleum products were found in and around these supply or transfer lines which contained numerous leaks and holes. (*See* Compl. ¶¶ 30–32.) Pursuant to directives from DCRA, the Corps completed removal of the USTs and contaminated soil from the property.

On September 28, 1992, DCRA issued a closure letter, addressed to Mobil, approving the remediation of the property. The letter identified Mobil Oil as the owner and operator of the UST systems discovered on the property.

The Corps now seeks to recover the costs it incurred in remediating the property totalling not less than $1,100,000.09, as well as lost profits associated with the use of the property during the remediation process and attorney's fees.

## III.  LEGAL STANDARDS

### A.  Fed.R.Civ.P. 12(b)(6)

A complaint should not be dismissed under Fed.R.Civ.P. 12(b)(6) unless "the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *See Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir. 1979) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). When passing judgment on the legal efficacy of a plaintiff's claim, the court may only look at the complaint, items in the record of the case, and matters of public record. *Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C.Cir.1979); *see Marshall County Health Care Auth.,* 988 F.2d 1221, 1226 (D.C.Cir.1993) (citing *Phillips* ).

The complaint must be liberally construed in the plaintiff's favor, including any inferences derived from the factual allegations. *Id.* The court, however, need not accept inferences unsupported by the facts. *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). The court also does not have to accept plaintiff's legal conclusions. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986); *Kowal,* 16 F.3d at 1276.[2] Therefore, a complaint may be dismissed under Fed. R.Civ.P. 12(b)(6) for lacking a cognizable legal claim. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir.1984). It is also within the court's power to dismiss

an issue of first impression under Fed. R.Civ.P. 12(b)(6). *See McKenna v. Washington Metro. Area Transit Auth.,* 670 F.Supp. 7, 8 & n. 1 (D.D.C.1986), *aff'd* 829 F.2d 186 (D.C.Cir.1987). This case presents the court with a variety of legal issues of first impression in this jurisdiction. Additionally, when a federal court is considering a state law claim, Fed.R.Civ.P. 12(b)(6) does not require the court to make a leap of faith and apply a legal theory that has not been recognized or applied in the particular state. *See Shoreham Hotel Ltd. Partnership v. Wilder,* 866 F.Supp. 1, 5–6 (D.D.C.1994) (declining to extend theory of promoter liability to situation in which it has never been applied in District of Columbia).

### B.  Fed.R.Civ.P. 56(c)

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the facts and any permissible inferences drawn from them in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). For a fact to be material, it must be a fact that the substantive law identifies as possibly affecting the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Consequently, the presence of a material fact is predicated on the existence of a legal theory that is viable under the nonmoving party's version of the facts. *Holloway v. Pigman,* 884 F.2d 365, 366 (8th Cir. 1989); *Park Center Inc. v. Champion Int'l Corp.,* 804 F.Supp. 294, 304 (S.D.Ala.1992); *see Dine v. Western Exterminating Co.,* No. 86–1857–OG, 1988 WL 25511, at *4 (D.D.C.

---

**2.** *See also Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.) (stating that plaintiff's legal conclusions need not be accepted when ruling on Rule 12(b)(6) motion), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968,

973 (8th Cir.1968) (same), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); *Ciro, Inc. v. Gold,* 816 F.Supp. 253, 257 (D.Del.1993) (same); *Dubbs v. CIA,* 769 F.Supp. 1113, 1115 (N.D.Cal.1990) (same).

Mar. 9, 1988) (granting defendants motion for summary judgment after concluding plaintiffs could not invoke principle of negligence *per se* ).

When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Crain v. Board of Police Comm'rs of Metro. Police Dep't,* 920 F.2d 1402, 1405–06 (8th Cir.1990). Such issues include matters turning on statutory interpretation. *See Edwards v. Aguillard,* 482 U.S. 578, 594–97, 107 S.Ct. 2573, 2583–85, 96 L.Ed.2d 510 (1987) (holding that no genuine issue of material fact existed as to statute's purpose because appropriate determination focuses on statute's language and legislative history).[3]

On cross-motions for summary judgment, the court shall not grant summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely in dispute. *Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975); *see* 6 James W. Moore, et al., *Moore's Federal Practice* ¶ 56.13, at 56–171 (2d ed. 1994) (discussing effect of cross-motions). In the instant case there is no genuine factual disputes that would preclude the granting of summary judgment. Rather, the fundamental questions to be resolved are legal ones.

## IV.  ANALYSIS

### A.  The Applicability of the District of Columbia Statute of Repose [4]

Defendants [5] argue that the District of Columbia Statute of Repose bars all the Plaintiff's statutory and tort claims against them. The statute encompasses actions brought to recover for an injury to real or personal property "resulting from the defective or unsafe condition of an improvement to real property...." D.C.Code Ann. § 12–310(a)(1)(A)(ii) (1995). All actions covered under the statute "shall be barred unless the case where injury is the basis of such action, such injury occurs within the ten-year period beginning on the date the improvement was substantially completed...." D.C.Code Ann. § 12–310(a)(1)(B).

This statute bars any action for damages by defective or unsafe improvements to real property when the injury occurs later than ten years from the date the improvement was substantially completed. *J.H. Westerman Co. v. Fireman's Fund Inc.,* 499 A.2d 116, 118 (D.C.1985). Although the court in *J.H. Westerman* acknowledged that D.C.Code Ann. § 12–310 "is broad and far-reaching," it expressly excluded owners and possessors from the statute's protection. *Id.* at 120. Moreover, the court pointed out that when Congress sought to exclude a particular class from the operation of the statute, it did so expressly. *Id.*

The statute protects "design professionals, 'includ[ing] inter alia, architects, engineers, contractors, and builders.' " *Id.* (citing S.Rep. No. 1274, 92nd Cong., 1st Sess. 1 (1972)). Design professionals "have no control over an owner whose neglect in maintaining an improvement that may cause dangerous or unsafe conditions to develop over a period of years." *Id.* at 121 (citing S.Rep. No. 1274, at 2).

Additionally, section (b)(2) of the statute expressly states that its limitation on actions

3. *See also Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1066 (Temp.Emer.Ct. App.1978) (holding that issues of statutory construction, legislative history, and legislative policy are legal questions making summary judgment an appropriate mechanism for resolving such issues); *WKB Entp., Inc. v. Ruan Leasing Co.,* 838 F.Supp. 529, 532 (D.Utah 1993) (holding that summary judgment is appropriate to resolve issues such as the meaning of statutes and whether or not statutes preclude action); *International Soc'y for Krishna Consciousness v. Rockford,* 425 F.Supp. 734, 738 (N.D.Ill.1977) (stating that when a decision turns on the meaning of words in a statute, that is a legal question for the court to decide), *aff'd in part, rev. in part,*

585 F.2d 263 (7th Cir.1978); *see generally* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* ¶ 2725, at 79–83 (2d ed. 1983) (stating that when issues of law are to be decided, such as legal construction of statutes, summary judgment may be granted).

4.  A statute of repose differs from an ordinary statute of limitations in that the specified time period begins to run not from the date on which a right of action accrues, but from the date the improvement to real property was completed.

5.  ARCO adopted Mobil's (the settling defendant) argument with respect to this issue.

is not applicable "to any action brought against the person who, at the time the defective or unsafe condition of the improvement to real property caused injury or death, was the owner of or in actual possession or in control of such real property." D.C.Code Ann. § 12–310(b)(2). The Corps specifically alleged that the Defendants were the owners or possessors of the USTs at the time the USTs caused the injury. In addition, the Plaintiff has alleged the existence of continuing injury caused by the Defendants. Therefore, the Defendants are not included within the class of persons that the statute was intended to protect from liability. The Statute of Repose is, therefore, inapplicable to this case and does not afford the Defendants protection from potential liability.

### B. Statute of Limitations for Injuries to Real Property

Defendants argue that D.C.Code Ann. § 12–301(3) (1995) may operate to bar the Corps' claims. The statute states, in pertinent part,

except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues:

(3) for the recovery of damages for an injury to real or personal property—3 years ...

(10) for the recovery of damages for an injury to real property from toxic substances including products containing asbestos—5 years from the date the injury is discovered or with reasonable diligence should have been discovered.

D.C.Code Ann. § 12–301. Defendants posit that the statutory period begins to run from the time a person knows or by the exercise of due diligence should have know of the existence of the cause of action. Because the Complaint was filed on January 19, 1993, the Corps' claim for strict liability is barred if the Corps should have known of the existence of the USTs or the contamination before January 19, 1990. Defendants further maintain that the Corps was put on notice of the potential for contamination by the Briggs Report [6] which was issued on December 11, 1989. This analysis, however, is inapplicable when the alleged wrong is of a continuing nature.

Thus the question of whether the statute bars Plaintiff's claims can be resolved by applying the continuing-tort doctrine. This doctrine holds that "[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Page v. United States*, 729 F.2d 818, 821 (D.C.Cir. 1984) (quoting *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir.1974), *vacated on other grounds*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)).[7] The D.C.Circuit has stated that

[s]ince usually no single incident in a continuous claim of tortious activity can "fairly or realistically be identified as the cause of significant harm," it seems proper to regard the cumulative effect of the conduct as actionable. Moreover, since "one should not be allowed to acquire a right to continue the tortious conduct," it follows logically that statutes of limitation should not run prior to its cessation.

*Id.* at 821–22 (footnotes omitted).

According to the Plaintiff, the Defendants engaged in a continuing tort, whose cessation occurred when the property was remediated in 1992. The court concludes that the statute

---

**6.** As referenced *infra*, in 1989, the Plaintiff engaged Briggs Associates, Inc. to conduct an environmental audit of the property. The study was undertaken to determine if a release of petroleum products or hazardous materials had occurred on the property. The Briggs Report concluded that the USTs had been removed and that there had been no releases of any hazardous or toxic materials or substances, including petroleum, on the property.

**7.** *See also Logiurato v. ACTION*, 490 F.Supp. 84, 91 (D.D.C.1980) (holding that where plaintiff suit is based on an allegedly ongoing tort, the cause of action does not accrue until the tortious activity has ceased); *Rochon v. FBI*, 691 F.Supp. 1548, 1563–64 (holding that under continuing tort doctrine, statute of limitations does not start to run when plaintiff knows or should have known about defendants' action, but rather, cause of action accrues, and limitations period begins to run, at the time tortious conduct ceases).

of limitations is therefore inapplicable in this instance and does not bar the Plaintiff's claims.

### C. Sovereign Immunity and WMATA

■ WMATA was created by Congress pursuant to an interstate compact between Virginia, Maryland, and the District of Columbia. WMATA argues that it is immune from Plaintiff's claims pursuant to § 80 of the Compact which provides, in pertinent part,

> The Authority [WMATA] shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agents committed in the conduct of any proprietary function ... but shall not be liable for any torts occurring in the performance of a governmental function.

D.C.Code Ann. § 1–2431, at 405 (1992) (containing § 80 of the Compact).

WMATA is thus only liable for torts committed in the performance of a proprietary function; it is immune from suit for any action occurring in the performance of a governmental function. Hence, WMATA's tort liability depends upon whether the activity in question involves a proprietary or governmental function.

In *Gillot v. Washington Metropolitan Area Transit Authority*, 507 F.Supp. 454 (D.D.C.1981), the plaintiff took issue with the safety precautions employed by WMATA as a parking lot owner, specifically citing inadequate lighting, poor placement of the exit gate, and failure to eliminate hiding places. The court held that the case involved a challenge to WMATA's exercise of a proprietary function for which an action could lie. *Id.* at 457. In *Dant v. District of Columbia*, 829 F.2d 69 (D.C.Cir.1987), the court held that problems that arise due to the faulty maintenance and operation of the fare collection machines are ministerial operations, and as such, immunity is waived by § 80 of the Compact. These decisions indicate that WMATA is not immune from claims arising from the "operation and maintenance" of a site used as parking lot or a fare collection

system. Similarly, the claims in the instant case arise out of the maintenance (while WMATA was the owner) of the property in question. Accordingly, the court finds that WMATA is not immune from the Plaintiff's claims.

### D. Common Law Claims

One of the main questions the court must resolve in this case is whether a subsequent occupier of commercial property has a cause of action in strict liability, negligence, or trespass for damages against a former occupant whose activities during its occupancy allegedly caused the property to become contaminated by petro-chemicals. The District of Columbia Court of Appeals has yet to specifically address this question. As a result, this court is required to predict what the District of Columbia's highest court would conclude if presented with this question. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Other jurisdictions have approached this question and reached differing results. The Maryland Court of Appeals has decided a case, *Rosenblatt v. Exxon Co.*, 335 Md. 58, 642 A.2d 180 (1994), involving the same issue as the one presented in the instant case. Although this court is not bound by the Maryland decision, due consideration should be given to the principles established in that decision. *See Gerace v. Liberty Mutual Insurance Co.*, 264 F.Supp. 95, 97 (D.D.C.1966) (holding that, "since the District of Columbia derives its common law from Maryland, decisions of Maryland courts on points not determined by the Court of Appeals of the District of Columbia or by the Supreme Court of the United States are, if not completely controlling, nevertheless, of great weight, of greater weight than the decisions of other states."). After careful consideration, this court has decided to adopt the legal conclusions reached by the court in *Rosenblatt*.

### 1. The Rosenblatt Decision [8]

In July 1986, Thomas Rosenblatt leased a parcel of real property located in Maryland,

---

8. Since *Rosenblatt* and the present case share not only a similar factual background but a substan-

tially similar legal posture (the parties in both cases advanced comparable arguments), and be-

from its owner, Earl Wenger. Rosenblatt planned to open an automotive lubrication business on the property. The previous tenant, Exxon Company, U.S.A. (hereinafter "Exxon") had leased the property from 1951 to 1985. It had subleased the property during that period to various independent dealers for use as a gasoline station. In 1951, Exxon installed gasoline storage tanks on the property; the tanks remained on the property until 1985, when Exxon's lease was terminated.

In preparing for the construction of his business, Rosenblatt hired an environmental consulting firm, ATEC, to perform a study of the property to identify potential construction problems. ATEC found extensive petroleum contamination of the soil and groundwater on the property. As a result of this discovery, the Maryland Department of the Environment was notified, conducted an investigation, and issued a Notice of Violation, advising that the contamination constituted a violation of Maryland law. Exxon thereafter commenced a remediation of the property.

Rosenblatt filed suit against Exxon seeking economic damages, including expenses incurred as a result of the contamination and lost future profits from his planned business. The complaint contained counts for negligence, strict liability, and trespass, among others.

### a. Strict Liability Claim

The Maryland Court of Appeals noted that it had previously adopted the strict liability definition set forth in the Restatement (Second) of Torts § 519 (1965). *Id.* at 185. Section 519 provides that "one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." *Id.* (quoting the Restatement (Second) of Torts § 519). The

court had applied the doctrine only to claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area (where the activity was conducted), which is carried on by a contemporaneous occupier of *neighboring* land. *Id.* at 186.

In *Rosenblatt,* the court was asked to expand the application of this doctrine to claims by subsequent occupants of the land on which the dangerous activity took place. Rosenblatt (as does the plaintiff in this case) relied primarily upon cases from two jurisdictions where recovery was allowed under a strict liability theory to subsequent occupiers of property contaminated by a previous occupant.

In *T & E Industries v. Safety Light Corp.,* 123 N.J. 371, 587 A.2d 1249 (1991), the New Jersey Supreme Court held that a subsequent occupier of property could maintain an action for strict liability against its predecessor who dumped radium on a portion of the property. The property had changed hands several times before T & E leased and eventually purchased the property. The court focused upon the dangerousness and inappropriateness of the activity, stating that those who, for their own benefit, introduce an extraordinary risk of harm to the community should bear the risk. *Id.* at 1257. The court concluded that this policy consideration justified the broadening of the doctrine's application beyond the claims of adjacent landowners. *Id.*

Similarly, in *Prospect Industries Corp. v. Singer Co.,* 569 A.2d 908 (N.J.1989), the court granted summary judgment in favor of the plaintiff as to its strict liability count against the prior owner, whose equipment had leaked toxic wastes causing the property to become contaminated. The court held that this leakage constituted an abnormally dangerous activity for which the prior owner should be held responsible. *Id.* at 911.[9]

cause the court is adopting the legal reasoning of *Rosenblatt,* a detailed review of both the facts and legal analysis employed in *Rosenblatt* is required.

**9.** Both of the cases held that the fact that the purchasers agreed to take the property "as is" did not affect the seller's strict liability because there was no evidence that the purchasers were

aware of the contamination when they entered into the contract, and a party ignorant of the presence of an abnormally dangerous condition would not be held to have assumed the risk posed by the condition. *See T & E Indus.,* 587 A.2d at 1259; *Prospect Indus. Corp.,* 569 A.2d at 912.

The court in *Rosenblatt,* proved unwilling to extend the doctrine of strict liability to the claim presented. The court stated that it had "taken care to limit the application of this doctrine because of the heavy burden it placed upon a user of land." *Rosenblatt,* 642 A.2d at 187. The court had limited the class of abnormally dangerous activities to those which would be abnormally dangerous relative to the area where they occur. *Id.* Moreover, the court stated that it had "limited the doctrine with regard to the class of actors to which it applies: [it] had required that the one engaging in the relevant activity have ownership or control over the land." *Id.* Lastly, it had required that "the act have a relation to the occupation or ownership of land." *Id.*

By those limitations the court had delineated the narrow circumstances in which the imposition of an additional burden on the occupier of land was justified. *Id.* at 187–88. When an owner or occupier of land engaged in activities, which were related to such ownership and occupation and which are abnormally dangerous in relation to the particular site, the court placed upon the actor the burden of bearing the risk of any harm to *neighbors* which arises from the activity, notwithstanding the absence of fault on the part of the actor. *Id.* According to the court, this burden is justified when weighing the rights of the actor, who benefits from the activity, against those of the occupants of neighboring land, who do not benefit and have no way of avoiding the harm to their property that may result from a dangerous activity on adjacent land. *Id.*

This rationale, however, is inapplicable to subsequent users who are able to avoid the harm completely by inspecting the property prior to purchasing/leasing it or who can negotiate for express contractual warranties. *Id.* Thus, it is not unreasonable to expect subsequent users to bear the risk of such harm. *Id.* Moreover, the court noted that the common law rule of caveat emptor was still applicable to the sale of commercial property. *Id.* The court thought that it would be unreasonable to hold the prior user liable to remote purchasers or lessees of commercial property who fail to inspect adequately before taking possession of the property. *Id.*

Additionally, the court felt that extension of the doctrine would be inconsistent with the principles set forth in the Restatement. *Id.* Section 519 of the Restatement makes clear that the harm for which the actor conducting the abnormally dangerous activity will be held liable *is harm to the person or property of another.* Restatement (Second) Torts § 519 (1965). The court refused to interpret this language to hold the actor strictly liable for harm to the actor's own property in those cases in which, at some time thereafter, the property changes hands. *Id.* The court thus declined to extend the doctrine's application to a claim for economic loss by a lessee of commercial property against a prior lessee for gasoline contamination to the leased property.

### b. Negligence Claim

With respect to Rosenblatt's negligence claim, the Maryland Court of Appeals first pointed out that the existence of a legally cognizable duty owed by the defendant to the plaintiff or a class of persons of which the plaintiff is a member is essential to a cause of action for negligence. *Id.* at 188. Thus, even if Rosenblatt could show that Exxon caused the property leased by him to be contaminated and that he had suffered an injury resulting from the contamination, he could not state a cause of action in negligence unless he first showed that Exxon owed a duty to him to avoid that injury. *Id.* Therefore, the question was whether Exxon owed a duty to Rosenblatt—a question of law, to be determined by the court. *Id.* at 189.

The court stated that the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant. *Id.* at 189. In the context of the case, the court concluded that they were not. There existed no relationship between the parties which would have made it foreseeable that an act or failure to act by Exxon would result in harm to Rosenblatt. *Id.* Moreover, the court was unwilling to impose such a duty for losses resulting from a condition

on the property that could have been discovered with reasonable diligence prior to occupancy, and thus could have been avoided. *Id.*

The court stated that the imposition of a duty upon one to another served to balance the burdens between the parties in avoiding the harm. *Id.* The court had recognized that care must be taken to avoid unduly burdening an occupant of land in the use of the land. *Id.* It had imposed a duty upon the occupant of land where it would be unreasonable to expect the other party to be able to protect itself from the harm, as in the case of occupiers of adjacent land or guests who come onto the land. *Id.* A lessee of commercial property, however, was, in the court's view, expected to make basic inquiry and inspection of the property prior to entering into a lease. When Rosenblatt entered into the lease, he was aware that the property had been used as a gasoline station. Thus, he knew or should have known that gasoline contamination was possible. He could have required that the property be tested for contamination or he could have negotiated express warranties in the lease. He was in a position to avoid completely the harm he alleged. Because there was no duty owed to Rosenblatt, the court concluded that Exxon was entitled to summary judgment on the negligence count as a matter of law.

#### c. Trespass Claim

When a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land, a trespass occurs. *Id.* The court noted that it had never recognized a trespass where the thing which intrudes actually entered the land during the "trespasser's" possession and the plaintiff took possession of the land subsequent to the "intrusion." *Id.* Rosenblatt relied on § 161 of the Restatement (Second) of Torts (1965) to support his position that Exxon committed a trespass when it allegedly caused the property to be contaminated during its occupancy. *Id.* at 190. Section 161 provides that: "A trespass may be committed by the continued presence on the land of a structure, chattel,

or other thing which the actor has tortiously placed there." Restatement (Second) Torts § 161 (1965).

The court found that § 161 did not support Rosenblatt's position because it explicitly provided that a trespass involved the tortious placing of something on the land and implicitly provides that the affected land is the land of another. *Id.* Exxon did not cause the contamination to occur during Rosenblatt's occupancy; the introduction of the contamination could only have occurred prior to its relinquishing possession of the land. *Id.*

#### 2. Application of *Rosenblatt* to the Present Case

A critical question to be answered in this case is whether the factual differences between *Rosenblatt* and the case *sub judice* are sufficient to prevent this court from dismissing the Plaintiff's claims for strict liability, negligence, and trespass. The court holds that they are not.

#### a. Strict Liability Claim

■ The Plaintiff maintains that there are two dispositive distinctions between the two cases, namely, in *Rosenblatt,* the plaintiff: (1) sought only economic damages and not property damages; and (2) failed to inspect the property prior to taking possession of the land. With respect to the latter difference, in *Rosenblatt,* the plaintiff not only failed to conduct a proper environmental investigation of the property, he failed to make such an examination after being put on notice by a geo-technical expert concerning possible contamination. Rosenblatt had an environmental study performed almost three years after he entered into the lease.

The Corps notes that in contrast to the *Rosenblatt* plaintiff, in the present case, the Corps conducted "state-of-the-art" due diligence prior to acquiring the property in 1985. However, the Corps has not elaborated as to the efforts it employed. According to the Corps, it used all reasonable means at that time to discover any "impediment to full development of the site." [10]

---

10. At oral arguments on the then outstanding dispositive motions, the court engaged in further inquiry as to the specifics of the Corps' efforts at evaluating the site prior to its purchase. Howev-

The Corps argues that regarding the other main difference between *Rosenblatt* and this case, Rosenblatt sought economic damages based on "speculative lost future profits from his planned business." Moreover, in *Rosenblatt,* Exxon remediated the property; in this case, the Corps has undertaken and paid for the remediation of the site.

The two proffered differences outlined by the Plaintiff do not suffice to distinguish the two cases. Plaintiff knew prior to the purchase of the property that the property had been used as a gasoline station. Moreover, as the Court in *Rosenblatt* stated, the purchaser of the property should have made "a basic inquiry and inspection of the property prior to entering into a lease. When Rosenblatt entered into the lease, he was aware that the property had been used for a gas station (as is presently the case). Thus, he knew or should have known that gasoline contamination was possible. He could have required that the property be tested for contamination and he could have negotiated express warranties in the lease. He was in position to avoid completely the harm he now alleges." *Id.* at 189. The same analysis applies to the Plaintiff in this case.

In the present case, the Plaintiff should have behaved in the same manner as the American Association for the Advancement of Science (AAAS), which purchased the property from the Plaintiff. The purchase agreement included the right, on the part of AAAS, to conduct a feasibility study on the property prior to the consummation of the sale. The purpose of the feasibility study was to perform environmental tests on the property. As a result of the study the environmental contamination was discovered. AAAS did not, however, incur any additional cost (for the remediation of the site) because it adequately protected itself pursuant to its purchase agreement with the Corps. AAAS was in a position to avoid harm through a contractual arrangement and intelligently took advantage of its opportunity to do so.

Furthermore, the court in *Rosenblatt* made an important distinction when it pointed out that the strict liability doctrine has only been applied in favor of occupants of neighboring land, not subsequent purchasers of land,[11] which is the posture the Plaintiff currently holds.

Thus, the question of whether the court would expand the doctrine of strict liability to apply for the benefit of subsequent purchasers did not depend on the issue of whether the activity in question was ultrahazardous, but on the status of the party invoking the doctrine. The status of the *Rosenblatt* plaintiff and the Plaintiff in this case is that of a subsequent owner, as opposed to an adjacent landowner. Moreover, the question of whether leaking underground storage tanks are abnormally dangerous is not a settled one. There is a split of authority on this issue as well. However, since this court is basing its determination to not extend the applicability of the strict liability doctrine to subsequent owners, this question need not be resolved.[12]

---

er, the court was unable to elicit any elaboration after considerable prodding. In addition, the court notes that the first study (the Briggs Report) of the property was conducted almost four years after the Plaintiff purchased the property. Moreover, the study was performed at the behest of another party (Chase Manhattan Bank, in conjunction with a mortgage placed on the property).

**11.** *See also Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93 (D.Mass.1990) (holding that plaintiff failed to state claim for strict liability for gasoline contamination of property by prior owner because harm was not property of another as required by doctrine).

**12.** The question of whether an activity is abnormally dangerous and subject to the strict liability standard is determined by the application of §§ 519 and 529 of the Restatement (Second) of Torts. Courts, in applying the factors outlined by §§ 519 and 520 to determine whether USTs are abnormally dangerous, have reached contradictory conclusions. For example, in *Arlington Forest Associates v. Exxon Corp.,* 774 F.Supp. 387 (E.D.Va.1991), the court held that the storage of gasoline in underground tanks at a service station is not an abnormally dangerous for which common law strict liability should be imposed. Plaintiff relies in great part on a New Jersey case, *T & E Industries, Inc., supra,* for the proposition that leaking USTs are abnormally dangerous. However, the court in that case was careful to caution against blanket rulings by its lower courts and instructed them to "make the determination about the-dangerous character of an activity one case at a time." *Id.* at 1259.

Finally, although the court in *Rosenblatt* emphasized that the nature of the Rosenblatt claim was one for lost future profits, it stated that the doctrine of strict liability was "not designed to protect against economic losses resulting from failed business opportunities." *Id.* However, the plaintiff in *Rosenblatt,* as does the Plaintiff in this case, sought economic damages, including the costs that resulted from the contamination of the property. Accordingly, the court is not convinced that the fact that Plaintiff only seeks the costs of remediation warrants a different result in this case.

### b. Negligence Claim[13]

■ The Corps cannot state a cause of action in negligence unless it shows that the Defendants owed a duty to it to avoid that injury. The question is therefore, whether the Defendants owed a duty to the Corps, an issue of law, to be determined by the court. The *Rosenblatt* court noted that it had "not heretofore extended the duty of the occupier of land to the avoidance of harm to one's own land that may cause injury or loss to a subsequent occupier of the same land." *Rosenblatt,* 642 A.2d at 189.

The court stated that "ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." *Id.* The court concluded that they were not because there existed no relationship between the parties which would have made it foreseeable that an act or failure to act by Exxon would result in harm to Rosenblatt. *Id.* Moreover, the court was unwilling to impose upon a lessee of commercial property a duty to remote successor lessees for losses resulting from a condition on the property that could have been discovered with reasonable diligence prior to occupancy and thus could have been avoided. *Id.* The same analysis is applicable to the circumstances surrounding this case. Therefore, Counts three, four, and seven are dismissed.

### c. Trespass Claim

■ The court in *Rosenblatt* held that it had never recognized a trespass where the thing which intrudes actually entered the land during the "trespasser's" possession and the plaintiff took possession of the land subsequent to the "intrusion." *Id.* Section 161 of the Restatement (Second) of Torts explicitly provides that a trespass involves the tortious placing of something on the land and implicitly provides that the affected land is the land of another. Restatement (Second) of Torts § 161 (1965). In the present case, the affected property is not that of another but property that was either leased or owned by the defendants when the alleged trespass occurred. Accordingly, Count two must be dismissed.

### E. Count Five Violation of the District of Columbia Underground Storage Tank Management Act of 1990

■ Count five of the Complaint alleges that Defendants violated provisions of the Underground Storage Tank Management Act of 1990, D.C.Code Ann. §§ 6–995.1 to –995.11 (1995) (codified as amended) (hereinafter "D.C. UST Act" or "UST Act"), and that the violations entitled the Plaintiff to recover damages for property remediation, increased interest and taxes, loss of rental income, and attorneys fees. (Compl. ¶¶ 35, 68–76.) Specifically, Plaintiff alleges that each of the Defendants is an "owner" as defined by the UST Act, D.C.Code Ann. § 6–995.1(4) and as owners, they failed to both notify the Mayor of the existence of their underground storage tanks, pursuant to D.C.Code Ann. § 6–995.2, and to comply with release notification requirements, pursuant to D.C.Code Ann. § 6–995.3. The question to be resolved is whether or not the D.C. UST Act's citizen suit provision allows private individuals to sue for money damages.

The District of Columbia Underground Storage Tank Act[14] is one step in a multi-

---

**13.** This negligence section also applies to the claims for common law indemnity and restitution. In order to proceed under those theories the plaintiff must demonstrate that the defendants owed it a legal duty.

**14.** The UST Act became effective on March 8, 1991. It was subsequently amended to correct the definition of owner and several typographical errors through the District of Columbia Underground Tank Management Act of 1990 Amend-

level process the District of Columbia is engaging in to obtain EPA approval to operate its own UST program [15] in lieu of the current federal program. In 1984, the United States Congress passed the Hazardous and Solid Waste Amendments Act, Pub.L. No. 98–616, 98 Stat. 3277 (1984) (codified at 42 U.S.C. §§ 6991–6991i (1988 & Supp. V 1993)), adding Subchapter IX Regulation of Underground Storage Tanks to the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6992k (1988 & Supp. V 1993) (hereinafter "RCRA"). Under RCRA, the states can develop their own petroleum UST programs and seek approval from the United States Environmental Protection Agency (hereinafter "EPA") to exercise primary responsibility in regulating USTs within their borders. 42 U.S.C. §§ 6991b(h)(7)–6991c (1988). A state program receives approval only if its regulatory regime is "no less stringent than the corresponding requirements" of RCRA and its effectuating regulations. 42 U.S.C. § 6991c(d)(2); 40 C.F.R. § 281.30–281.38 (1994). Once a state obtains approval, the state plan will govern in lieu of the federal program. If the state program has not obtained full EPA approval, RCRA continues to apply in addition to any independent state or local regulations.[16]

Like RCRA, the D.C. UST Act provides a means of redress for private citizens aggrieved by violations of the Act. *See* 42 U.S.C. § 6972 (1988) (RCRA citizen suit provision); D.C.Code Ann. § 6–995.11 (UST Act citizen suit provision). Plaintiff maintains that D.C.Code § 6–995.11 allows private citizens to sue for money damages and that it is thus entitled to $1,100,000.09 in such damages.

The issue of whether a statute expressly or impliedly provides for a particular cause of action involves matters of statutory construction, legislative history, and legislative policy. As such, this issue is a strictly legal one for the court to decide. Whether the D.C. UST Act provides an express or implied cause of action for money damages is an issue of first impression; neither the United States Court of Appeals for the Circuit of Columbia nor the District of Columbia Court of Appeals has had an opportunity to consider the issue as presently framed.

The D.C. UST Act provides that "[a]ny person aggrieved by a violation of any requirement of this subchapter or rule issued pursuant to this subchapter may commence a civil action ... against any person who is alleged to be in violation." D.C.Code Ann. § 6–995.11(a). Under this section of the statute, the court has jurisdiction to enforce any of the UST Act's requirements and to "order any action necessary to correct the violation, and to impose any civil penalty provided for the violation." D.C.Code Ann. § 6–995.11(b). Read in the context of the UST Act, the language suggests to this court that it has the power to enforce the UST Act's provisions, restrain responsible parties from causing further harm, and to order such parties to clean up petroleum UST releases so as to "correct the violation." It is not

ment Act of 1992, D.C.Law No. 9–253 (codified in scattered sections of Title 6 of the D.C.Code Ann.) (effective on September 29, 1992).

**15.** Regulations were promulgated by the District of Columbia Department of Consumer and Regulatory Affairs (hereinafter "DCRA") to effectuate the UST Act. They went into effect on November 12, 1993. 40 D.C.Reg. 7835–931 (1993). The notification provision of the UST Act required compliance within 120 days after March 8, 1991. D.C.Code Ann. § 6–995.2. No regulations were needed to comply with this provision.

  Responsible parties could also comply with the release notification requirements. *See* D.C.Code Ann. § 6–995.3. While at the time of this suit regulations had not been promulgated to identify what releases would be ex-

cepted from the release notification process because their effects would be deemed *di minimis*, responsible parties knew that any exceptions could not be any less stringent than the federal regulations. *See* 42 U.S.C. § 6991c(b)(1) (1988) (stating that state standards must be no less stringent than federal standards). Responsible parties knew, by express language in the statute, who to report a release to and what information the report is supposed to contain. If responsible parties were complying with the federal regulations in force at the time, they would know or have reason to know of a release. *See* 53 Fed.Reg. 43,322–82 (1988).

**16.** The parties do not raise, and this memorandum does not address, the issue of preemption.

readily apparent to the court that it can award money damages to subsequent real property owners who have "corrected the violation" by cleaning up a petroleum release. The language is, however, ambiguous, failing to expressly provide for a private cause of action for money damages.

Absent express authorization, the court must look to see if the statute creates an implied right of action. Like the federal courts, the District of Columbia courts apply the test delineated by the United States Supreme Court in *Cort v. Ash*, 422 U.S. 66, 79, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) to determine the existence of statutorily implied causes of action. *See Kelly v. Parents United*, 641 A.2d 159, 163–65 (D.C.1994) (applying the *Cort* test to District of Columbia Public School Nurse Act, D.C.Code § 31–2421 (1993)); *see also Twyman v. Johnson*, 655 A.2d 850, 856–57 (D.C.1995) (citing *Cort* and *Kelly* in its implied private cause of action analysis). Specifically, the court must determine:

> First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Kelly*, 641 A.2d at 164 (citing *Cort*, 422 U.S. at 78, 95 S.Ct. at 2088) (emphasis in original).[17] The Supreme Court has held that the single most important *Cort* factor is legislative intent, explicit or implicit. *Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992) ("The most important inquiry here ... is whether Congress intended to create the private remedy sought by the plaintiffs.").[18] The D.C.Court of Appeals has also adopted this view. *See Kelly*, 641 A.2d at 164 ("[L]egislative intent.... has become the most important factor of the *Cort*

inquiry."). As such, the court will examine this factor first.

The UST Act's scant legislative history does not clarify the terminology used in the statute. In the Council of the District of Columbia's Committee on Public Work's report on the UST Act, the single sentence regarding citizen suits states that the citizen suit section "[e]stablishes that any citizen may seek relief in a court of competent jurisdiction for any hardship suffered as a result of any person's failure to comply with the provisions of this Act." Council of the District of Columbia's Comm. on Public Works, Report on Bill 8–383, District of Columbia Underground Storage Tank Management Act of 1990, at 7 (November 19, 1990) (hereinafter "Report on Bill 8–383"). The type of relief available is not specified. However, there is statutory language that limits the court's ability to grant relief to the ordering of "any action necessary to correct the violation" and the imposition of civil penalties. D.C.Code Ann. § 6–995.11. Based on the sparse legislative history available, the court is unable to conclude that the Council intended that the D.C. UST Act's citizen suit provision serve as a basis for private individuals' suits for money damages.

The court's inquiry, however, is not at an end. While the Council could create a UST program that was more stringent than RCRA, there is absolutely no indication that the Council intended do so. To the contrary, it appears than the Council intended that the D.C. UST Act would serve only to meet the requirements of RCRA. As stated by the Committee on Public Works, the purpose and effect of the D.C. UST Act is to "provide the Mayor with adequate statutory authority to develop and implement a comprehensive regulatory program ... capable of meeting rigorous federal standards...." Report on Bill

---

17. In *Kelly*, the District of Columbia Court of Appeals did not apply the fourth *Cort* factor, which weighs whether or not the cause of action is relegated to state law so that it would be inappropriate to infer one based on federal law, because it is inapplicable when a federal statute is not involved. *Kelly*, 641 A.2d at 163 n. 10.

18. *See also Edwards v. District of Columbia*, 821 F.2d 651, 654–55 n. 4 (D.C.Cir.1987) (relating that legislative intent is most important factor); *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789 (D.C.Cir.1983) (stating that legislative intent is dispositive factor), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984).

8–383, at 4. The court reads this section to encompass the citizen suit provision.[19]

Broken down into its essential elements, the D.C. UST Act's citizen suit provision allows the courts to:

(1) "enforce the [statute's] requirement[s] ..."

(2) "order any action necessary to correct the violation [of the statute, regulations, etc.] ... [and]

(3) "impose any civil penalty provided for the violation."

In comparison, RCRA's citizen suit provisions, codified at 42 U.S.C. § 6972 (1988), give the district court jurisdiction to:

(1) "enforce the permit, standard, regulation, condition, requirement, prohibition, or order ..."

(2) "restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste ..."

(3) "order such person to take such other action as may be necessary, or both ... and"

(4) "apply any appropriate civil penalties under section 6928(a) and (g) of this title."

In comparing the two provisions, except for the absence of statutory language in the D.C. UST Act regarding a court's ability to restrain certain persons, the language is essentially the same.

Unlike the absence of case law on the D.C. UST Act's citizen suit provision, there is a substantial amount of law on RCRA's citizen suit provisions. Courts confronting this issue have almost unanimously concluded that RCRA's citizen suit provisions, 42 U.S.C. § 6972(a)(1)(A) and (a)(1)(B), allow for abatement and injunctive measures, but not for money damages.[20]

---

**19.** Even if the statement pertains only to the RCRA technical standards, the language in the citizen suit provision regarding the court's ability to fashion relief is so similar as to allow the court to infer that the D.C. Council intended to model the D.C. UST Act's citizen suit provision after the RCRA provisions. At the very least, it allows the court to draw comparisons between similar statutory provisions. *Compare* 42 U.S.C. § 6972(a) (1988) *with* D.C.Code Ann. § 6–995.11 (1995).

**20.** *See, e.g., Walls v. Waste Resource Corp.,* 761 F.2d 311, 315–16 (6th Cir.1985) (affirming trial court's ruling dismissing plaintiffs' counts for damages because RCRA's citizen suit provisions do not expressly or impliedly allow private individuals to seek damages); *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 336–37 (4th Cir.1983) (RCRA citizen suit provisions do not allow individuals to pursue private remedies, only relief from plaintiffs acting as private attorney generals); *Agricultural Excess & Surplus Ins. v. A.B.D. Tank & Pump Co.,* 878 F.Supp. 1091, 1098 (N.D.Ill.1995) (holding that purchaser of underground petroleum storage tank could not bring action under RCRA to recoup remediation expenses); *Portsmouth Redevelopment and Housing Auth. v. BMI Apartments Assoc.,* 847 F.Supp. 380, 385 (E.D.Va.1994) (holding that court lacked power to award money damages for remediation because RCRA only allows for claims by parties acting as private attorney generals); *Kaufman v. Unisys Corp.,* 822 F.Supp. 1468, 1476–76 (N.D.Cal.1993) (holding that there is no implied private remedy for damages or restitution); *Fallowfield v. Strunk,* Nos. 89–8644, 90–4431, 1993 WL 157723, at *14–16 (E.D.Pa. May 11, 1993) (holding that plaintiffs cannot collect monetary relief under RCRA); *Gache v. Town of Harrison, N.Y.,* 813 F.Supp. 1037, 1045 (S.D.N.Y.1993) (stating that RCRA does not allow plaintiff in citizen suit to recover costs of remediation.); *Polcha v. AT & T Nassau Metals Corp.,* 837 F.Supp. 94, 96–97 (M.D.Pa.1993) (holding that no private cause of action to recover damages for personal injuries is expressly or impliedly created by RCRA); *Milbut v. Hi–Score Plant Food Co.,* No. 91–2008, 1992 WL 396774 (E.D.Pa. Dec. 24, 1992) (stating that plaintiffs cannot assert claim for damages under RCRA because RCRA allows for only prospective relief); *Commerce Holding Co., Inc. v. Buckstone,* 749 F.Supp. 441, 445 (E.D.N.Y.1990) (holding that RCRA does not provide private action for damages, nor should one be implied because it does not comport with statute's purpose of allowing parties to bring actions only if genuinely acting as private attorney generals); *see generally* Kevin R. Duncan and B. Todd Bailey, *Innocence Amid "LUST": The Innocent Buyer and Leaking Underground Storage Tanks Containing Petroleum,* BYU J. of Pub.L. 245 (1993). *But see KFC Western, Inc. v. Meghrig,* 49 F.3d 518, 520–22 (9th Cir. 1995) (RCRA allows private plaintiffs to sue for restitution of clean-up cost for contamination that posed imminent and substantial danger in past); Crowell & Moring *RCRA Hazardous Wastes Handbook,* at 14–23) (10th ed.1993) (asserting that *Zands v. Nelson,* 779 F.Supp. 1254 (S.D.Cal.1991) stands for proposition that owners and operators can seek reimbursement of cleanup costs from other responsible private parties).

The RCRA citizen suit provisions are an enforcement mechanism by which citizens can act as "private attorney generals" to ensure compliance. *See supra* note 20. Congress has placed such private attorney general provisions in most modern environmental statutes [21] so that private citizens are able to play a role in protecting the environment along with federal and state agencies. While the citizen suit provisions are not models of clarity, the courts, including the United States Supreme Court, have consistently held that the federal environmental statutes generally do not grant private citizens the right to collect money damages.[22] Thus while civil penalties payable to the federal government are a significant part of the enforcement strategy, monetary damages payable to private plaintiffs are not. *See* Austin, *supra* note 22, at 230, 237–38. These citizen suit provisions do not offer any "private re-wards," because as private attorney generals, citizen-plaintiffs are supposed to be guided by the public benefits. *See Middlesex,* 453 U.S. at 15–18 & n. 27, 101 S.Ct. at 2623–25 n. 27.[23]

The House Committee explicitly stated that the RCRA citizen suit provisions confer "on citizens a limited right . . . to abate [24] an imminent and substantial endangerment." *Id.* When Congress has wanted to provided for the recovery of remediation costs, it has explicitly done so. *See* 42 U.S.C. § 6991b (Supp. V 1993) (delineating explicitly when government may seek recovery of cost for remediating petroleum contaminated property in emergency situations under RCRA); 42 U.S.C. § 9607(a)(4)(A), (a)(4)(B) (1988 & Supp. V 1993) (stating when government and individuals can seek recovery of response costs under CERCLA).[25]

**21.** *See e.g.,* Toxic Substances Control Act § 20, 15 U.S.C. § 2619 (1994); Endangered Species Act § 11(g), 16 U.S.C. § 1540(g) (1988); Clean Water Act § 505, 33 U.S.C. § 1365 (1988); Marine Protection, Research, and Sanctuaries Act § 105(g), 33 U.S.C. § 1415(g) (1988); Deepwater Ports Act § 16, 33 U.S.C. § 1515 (1988); Safe Drinking Water Act § 1449, 42 U.S.C. § 300j–8 (1988); Noise Control Act § 12, 42 U.S.C. § 4911 (1988); Clean Air Act § 304, 42 U.S.C. § 7604 (1988 & Supp. V 1993); Outer Continental Shelf Lands Act § 23, 43 U.S.C. § 1349(a) (1988); *see generally* Michael S. Greve, *The Private Enforcement of Environmental Law,* 65 Tul. L.Rev. 339 (1990).

**22.** *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981) (holding that private plaintiffs could not recover damages under Clean Water Act, 33 U.S.C. § 1365 (1988) or Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1415 (1988)); *see supra* note 20 (RCRA cases); *see also* Jeannette L. Austin, Comment, *The Rise of Citizen–Suit Enforcement in Environmental Law: Reconciling Private and Public Attorneys General,* 81 Nw.U.L.Rev. 220, 230–31 (1987); Adeeb Fadil, *Citizen Suits Against Polluters: Picking Up the Pace,* 9 Harv. Envtl.L.Rev. 23, 28 n. 31 (1985).

Because the language of the two statutes in *Middlesex* do not materially differ from citizen suit provisions in other environmental statutes, this holding is applicable to those as well. *See Middlesex,* 453 U.S. at 14, 101 S.Ct. at 2623.

There are, however, two exceptions to this general statement. The Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9613(f), (g) (1988) [herein-after "CERCLA"] expressly allows for a private right of action after the Superfund Amendments and Reauthorization Act, Pub.L. No. 99–499, 100 Stat. 1613 (1986). The Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270(f) (1988) also allows citizens to sue for damages, but, like CERCLA, does so explicitly.

**23.** *See also* Michael S. Greve, *The Private Enforcement of Environmental Law,* 65 Tul.L.Rev. 339, 341–42 (1990) (presenting scathing and controversial, but nonetheless useful analysis of citizen suit provisions).

**24.** To abate means to act in such a way as "to bring down or demolish, to put an end to, to do away with, to nullify, to make void." *Black's Law Dictionary* 4 (6th ed.1990).

**25.** This court finds the recent Ninth Circuit case, *KFC Western, Inc. v. Meghrig,* 49 F.3d 518 (9th Cir.1995) unpersuasive in this regard. The majority opinion flatly rejects the numerous cases on point and chooses instead to analogize from two Eighth Circuit cases interpreting a RCRA provision with similar language. *See KFC* 49 F.3d at 521–22 (citing *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373 (8th Cir.1989); *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726 (8th Cir.1986)). Neither *Aceto* nor *Northeastern Pharmaceutical* deals with citizen suit provisions and their unique role in enforcing federal environmental statutes. Additionally, both cases fail to provide useful analysis on the issue of remediation costs. Moreover, in *Furrer v. Brown,* 62 F.3d 1092 (1995), a case recently decided by the United States Court of Appeals for the Eighth Circuit, the court specifically challenged the legal foundation of the *KFC*

The next prong of the *Cort* test requires the court to determine if the Plaintiff is a member of a class for whose especial benefit the statute was enacted. *See Cort,* 422 U.S. at 78, 95 S.Ct. at 2087. In reviewing the legislative history of the D.C. UST Act, the court can find no indication that the statute was created for the especial benefit of individuals like the plaintiff, but many indications that the D.C. UST Act was enacted to protect the public's health. The legislation was a result of the Council's "ongoing commitment to a safe and healthy living environment." Report on Bill 8–382, at 3. The legislation was drafted after the Council's Committee on Public Works monitored and evaluated the District of Columbia's "efforts to protect the public health, safety, and welfare from real and potential ecological threats posed by leaking underground storage tanks." *Id.* In enacting the D.C. UST Act, the Council was seeking to obtain authorization to implement its own UST program in lieu of RCRA. *Id.* at 3. Its understanding was that the RCRA UST provisions were enacted to stop "a major source of soil and groundwater contamination." *Id.* at 1. Preventing water contamination was the most important reason because "one-half of the U.S. population depends primarily on groundwater as a source of drinking water." *Id.* at 2.

Absent any indication to the contrary, the court concludes that the D.C. UST Act's citizen suit provision is not broader than RCRA's citizen suit provisions and that the UST Act was not enacted for the especial benefit of a class of which the plaintiff is a member. Implying such a cause of action would not be consistent with the underlying enforcement scheme of allowing citizens to act as private attorney generals. Thus, the third prong of the *Cort* test is not met either.

Accordingly, the court holds that private individuals can utilize the D.C. UST's citizen suit provision to sue responsible parties to compel compliance with the UST Act and to abate any effects of petroleum UST releases, but not to collect money damages.[26]

### F. Count Six Negligence Per Se for violation of the D.C. UST Act

■ In Count six of the Complaint, Plaintiff alleges that Defendants' violations of the D.C. UST Act constitute negligence *per se.* This is an issue of first impression in this jurisdiction, as neither the federal courts nor the District of Columbia courts have confronted the issue of whether the negligence *per se* doctrine is applicable to the D.C. UST Act. The "general rule" in the District of Columbia is that:

> where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law.

*Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C.1982) (citing *Richardson v. Gregory,* 281 F.2d 626, 629 (D.C.Cir.1960))[27]. This is essentially a summarization of §§ 286 and 288 of the Restatement (Second) of Torts, which specify when a standard of conduct defined by statute or regulation will be adopted by the courts. Restatement (Second) of Torts §§ 286, 288 (1965); *see Thoma,* 632 A.2d at 727 (citing the Restatement). Section 286 states:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an

---

*Western* decision. The court stated that, "the court (the Ninth Circuit) began with a questionable proposition and then mistakenly reached its result in reliance on cases from this Circuit (the Eighth Circuit) that, when carefully analyzed, do not support the *KFC Western* decision." *Id.* at 1100.

**26.** As the court finds no express or implied private right of action for money damages, and hence no cognizable legal theory under which Plaintiff can seek redress, the court need not

reach the issues of whether the Plaintiff has adequately identified the Defendants as owners under the UST Act or if a citizen suit can be brought after a site has been remediated.

**27.** *See Thoma v. Kettler Bros., Inc.,* 632 A.2d 725, 727 (D.C.1993) (stating negligence *per se* standard used in District of Columbia); *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1273 (D.C.1987) (same); *Lewis v. WMATA,* 463 A.2d 666, 674 (D.C.1983) (same); *Dine,* Nos. 89–8644, 90–4431, 1988 WL 25511, at *4 (same).

administrative regulation whose purpose is found to be exclusively or in part

    (a) to protect a class of persons which includes the one whose interest is invaded, and

    (b) to protect the particular interest which is invaded, and

    (c) to protect that interest against the kind of harm which has resulted, and

    (d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286, at 25 (1965). The courts, however, should not use the requirements of a statute as the standard of conduct of a reasonable person when the purpose of the statute is found exclusively:

    (a) to protect the interests of the state or any subdivision of it as such, or

    (b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

    (c) to impose upon the actor the performance of a service which the state or any subdivision of it of it undertakes to give to the public, or

    (d) to protect a class of persons other than the one whose interests are invaded, or

    (e) to protect another interest than the one invaded, or

    (f) to protect against other harm than that which has resulted, or

    (g) to protect against any other hazards than that from which the harm resulted.

Restatement (Second) of Torts § 288, at 30 (1965).

Sections 288(b) and (f) of the Restatement apply to the instant case. When a statute is only intended to secure for "individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individuals from harm" a negligence *per se* claim usually does not apply. Restatement (Second) of Torts § 288(b) (1965) (Reporter's Notes, comments on clause (b)). Additionally, the principle of negligence *per se* should not apply to situations in which the harm suffered by the plaintiff differs from the harm sought to be protected by the statute. Restatement (Second) of Torts § 288(f) (1965). None of the D.C. UST Act's provisions suggest that the class of persons to be protected is any less broad than the entire population of the District of Columbia. Moreover, the harm suffered by the Plaintiff is distinct from that of the public at large. The D.C. UST Act was enacted to protect the public from the harm of contaminated drinking water, *see* Report on Bill 8–383, at 1–4, not to protect a certain class of persons seeking to recover monetary losses. *See Dine v. Western Exterminating Co.*, No. 86–1857–OG, 1988 WL 25511, at *3–4 (D.D.C. Mar. 9, 1988) (dismissing negligence *per se* claims under federal and District of Columbia pesticide statutes because there was no specific protected class of persons and harm suffered by plaintiff was different from harm statute aimed to address).[28]

In applying the test set out in *Ceco* and the principles enunciated in the Restatement, the court concludes that the Plaintiff cannot invoke the principle of negligence *per se* in the context of this case.

### H. Count Eight Negligence Per Se for violations of the 40 C.F.R. Pts. 280–81

█ In Count eight of the Complaint, Plaintiff alleges that the Defendants' violations of various provisions of the RCRA regulations contained in 40 C.F.R. Pts. 280–81 [29]

---

**28.** *See also Fallowfield Dev. Corp. v. Strunk,* Nos. 89–8644, 90–4431, 1991 WL 17793, at * 8–9 (E.D.Pa. Feb. 11, 1991) (dismissing negligence *per se* claim under Pennsylvania environmental laws after applying principles listed in Restatement (Second) of Torts §§ 286, 288).

**29.** The Plaintiff consistently refers to violations of the "D.C. Regulations." Plaintiff is really referring to the federal regulations promulgated to effectuate RCRA. DCRA is authorized to enforce federal regulations until its own program receives full authorization from the EPA to operate in lieu of the federal statutory and regulatory scheme. *See* Memorandum of Understanding Between the U.S. Environmental Protection Agency Region III and the District of Columbia at 1 (effective May 31, 1988) (allowing District of Columbia to enforce federal UST program within

constitute negligence *per se*. This court determines that the Plaintiff is unable to bring such a claim.

In applying the same analysis used to evaluate Plaintiff's negligence *per se* claim under the D.C. UST Act, the court determines that RCRA does not have the specific purpose of protecting a particular class of people. It was enacted to protect the public from soil and water contamination, not to protect a certain class of persons seeking to recover monetary damages. None of the RCRA provisions indicate that the class of persons to be protected is any less broad than the entire population of the United States. Therefore, allowing Plaintiff to proceed with its negligence *per se* claim would be improper.

The court also recognizes that whether or not the Plaintiff can assert a cause of action based on negligence *per se* is an issue akin to the question of whether a private cause of action exists under a statute. *Frederick v. Thomas*, 578 F.2d 513, 517 (3d Cir.1978); *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 857 F.Supp. 838, 848 (D.N.M.1994).[30] The United States Court of Appeals for the Third Circuit has noted,

> most formulations of the standards for implying a private cause of action center on the presence or absence of a legislative intent to impose civil liability. In theory, at least, application of the negligence *per se* doctrine represents a judicial policy judgment independent of legislative intent with respect to the imposition of civil liability. Both, however, address the question of whether the policy behind the legislative enactment will be appropriately served by using it to impose and measure civil damage liability.

*Frederick v. Thomas*, 578 F.2d at 517, n. 8 (3d Cir.1978). In adopting a statutory standard of conduct, courts are trying to further the underlying policy that the statute seeks to promote. The standard of conduct is adopted out of respect for the legislative branch. *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 428 (M.D.Pa.1989) (citing W. Page Keeton, *et al.*, *Prosser and Keeton on Torts* § 36, 222 (5th ed. 1984)).

Having found no express or implied private cause of action for money damages under RCRA, and finding a Congressional intent that the RCRA citizen suit provisions serve only to allow private plaintiffs to act as "private attorney generals," the court determines that Plaintiff's negligence *per se* claim for violations of 42 C.F.R. Pts. 280–81 should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant ARCO's motion to dismiss is **granted,** Defendant WMATA's cross-motion for summary judgment is **granted,** and Plaintiff's motion for summary judgment is **denied.**

A separate order shall follow.

**SO ORDERED.**

---

the District); 42 U.S.C. § 6991c (1988) (establishing when state program will operate in lieu of federal program). Since DCRA was enforcing the federal regulations at the time this suit was filed, the Plaintiff has labeled the regulations as "D.C. Regulations."

**30.** *See Isely v. Capuchin Province*, 880 F.Supp. 1138, 1150 n. 14 (E.D.Mich.1995) (stating that because no private right of action existed, issue of negligence *per se* does not arise); *Rodriguez v. American Cyanamid Co.*, 858 F.Supp. 127, 129–30 (D.Ariz.1994) (stating that issue of negligence *per se* is closely related to existence of implied private cause of action); *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 428 (M.D.Pa.1989) (same).