DAVIS BROS., INC., Plaintiff,

v.

THORNTON OIL CO., et al., Defendants.

No. 5:96–CV–304–1(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

July 23, 1998.

Alfred B. Adams, III, Regina Benton Reid, Atlanta, GA, for plaintiff.

F. Edwin Hallman, Jr., David Charles Moss, Anne L. Hunt, Atlanta, GA, for Defendant Thornton Oil Company.

M. Jerome Elmore, Michael Brian Terry, Atlanta, GA, for Defendants Conoco, Inc., Kayo Oil Company.

## ORDER

OWENS, District Judge.

Davis Brothers, Inc. ("Davis Bros."), filed suit against Thornton Oil Company ("Thornton") and Conoco/Kayo Oil Company ("Conoco")[1] under several theories alleging it is entitled to monetary damages resulting from a gasoline leak that occurred while the defendants operated a gas station on property leased from Davis Bros.[2] Thornton filed a cross-claim against Conoco arguing it should

---

[1]. Because Kayo was a subsidiary of Conoco and Conoco has assumed the rights and liabilities of Kayo during the lease term, for all intents and purposes the two entities are one and the same with regard to this case. This order therefore refers to Kayo only when setting forth the factual history of the case, in order to avoid confusion with regard to which entity actually entered into the agreements referenced.

[2]. This suit is for damages to the property on which the hotel run by Davis Bros. is located. Davis Bros. originally filed a separate suit for damages related to the service station site naming Conoco as the only defendant (Civil Action No. 5:95–cv–280–1 (WDO)). That case was settled, leaving only this suit for damages to the hotel site, which was also purchased by Davis Bros. through the option purchase detailed below.

be indemnified by Conoco for all damages and costs, including attorney's fees, associated with this litigation pursuant to one or both of two separate agreements.[3] The court held a hearing on several motions on January 12, 1998. Subsequent to the hearing, Davis Bros. and Conoco settled all claims between them, and Davis Bros. assigned its claim against Thornton to Conoco.

Currently before the court are Thornton's motion for summary judgment on Davis Bros.' claims against it, and cross motions for summary judgment filed by Thornton and Conoco against each other. In addition, Conoco has filed a motion, opposed by Thornton, requesting that the court substitute it as plaintiff pursuant to FEDERAL RULE OF CIVIL PROCEDURE 25(c). Finally, Davis Bros. filed a motion to strike a portion of Thornton's reply in support of Thornton's motion for summary judgment. Having carefully considered the arguments of counsel, the relevant case law and the record as a whole, the court issues the following order.

## I. Undisputed Facts

The following facts are undisputed, but the legal conclusions to be taken from those facts are, of course, in dispute.

In 1975, Davis Bros. leased with an option to buy four contiguous properties located on and near Lee Street and Georgia Highway 42 in Forsyth, Georgia. On September 10, 1975, Thornton subleased one of the properties from Davis Bros., installed underground storage tanks (USTs), and began operating a service station on the property. The station was in operation throughout the term of the sublease, which lasted from September 10, 1975 until September 20, 1984. Davis Bros. built a motel on another of the properties; it has been operating as a Days Inn since 1991. It is this motel site that forms the basis of this lawsuit.

On August 1, 1984, Kayo, pursuant to a sale and purchase agreement with Thornton, bought Thornton's leasehold interest in the station site as well as the property and equipment of the service station, including the USTs, on an as-is basis. The sale and purchase agreement contained the following mutual indemnity clause:

*Section VII*

Seller [Thornton] shall protect, defend, indemnify and hold harmless Kayo from and against any loss, cost, damage, claim or expense, including reasonable attorney fees, resulting from or arising out of [Thornton's] ownership, possession or use of the assets associated with each location, including without limitation any leaks, spills, or discharges of gasoline or other petroleum products, or contamination of groundwater, *prior to the time Kayo takes possession of such location.* Kayo shall protect, defend, indemnify, and hold harmless Seller [Thornton] from and against any loss, cost, damage, claim or expense, including reasonable attorney fees, resulting from or arising out of Kayo's ownership, possession or use of the assets associated with such location, including without limitation any leaks or spills or discharges of gasoline or other petroleum products, or contamination of groundwater, *from and after Kayo takes possession of same.* (emphasis added).

Sometime after Kayo purchased the site from Thornton, Conoco assumed Kayo's obligations. Conoco then operated the gas station until April of 1989, at which time it closed the station and removed the USTs. Upon removal of the USTs, Conoco discovered that there had been gasoline leakage from the USTs into the surrounding soil. Conoco reported the leakage to the Georgia Environmental Protection Division (EPD), and the EPD required Conoco to initiate immediate cleanup of the contamination. Due to disagreements regarding the proper methods to be used, the site is still in the process of being cleaned up even though more than nine years have passed since the contamination was found.

On June 25, 1990, Davis Bros. exercised the option to purchase all four of the leased properties for $300,000 from the original owners.[4] Sometime in 1991 or 1992, Conoco

---

**3.** In addition, Conoco originally filed a cross-claim against Thornton in this case which was later dismissed without prejudice.

**4.** It is unclear from the record whether Davis Bros. was aware of the contamination at the time it exercised the option.

sued Thornton to recover costs incurred in environmental clean-up of several properties, one of which was the site of the service station in Forsyth. On November 22, 1993, Thornton and Conoco entered into a Settlement Agreement in settlement of all claims related to the several properties, including the Forsyth site. That settlement agreement provided, in relevant part:

2. Conoco, for itself and its successors and assigns, hereby fully, irrevocably and unconditionally releases, acquits and forever discharges Thornton and its attorneys, successors and assigns from any and all claims, demands, actions, or causes of actions [sic] arising out of any alleged contamination of the Properties, or arising out of any contract, agreement, representation or warranties made by, or act or omission of, either party relating to the condition, clean-up or remediation of the Properties or improvements or changes thereto, including but not limited to the claims asserted in the Action.

3. The releases set forth above shall not inure to the benefit of any other person or entity, other than as specifically set forth above, and shall relate only to the Properties.

\* \* \* \* \* \*

7. The Parties acknowledge that this Agreement supersedes all prior discussions and agreements and that this Agreement constitutes the sole and entire agreement between the Parties with respect to all such matters contained herein.

Throughout the entire period since the contamination was discovered, and throughout this litigation, Conoco has agreed to pay for all costs associated with the clean-up of the site.

## II. Disputed Fact Issues

There are two main fact issues disputed by the parties. First, the parties dispute whether the tanks were already leaking at the time of Thornton sold the station to Kayo in 1984. The record contains mixed evidence on this point.

Evidence tending to show the tanks were already leaking when Kayo took over the station is as follows. As permitted under the agreement, Kayo tested the USTs to determine if any were leaking. Kayo's tests indicated that at three of the four tanks at the site gasoline was escaping at a slightly above-normal rate, and the monthly petroleum inventory taken on September 30, 1984, indicated a loss of 624 gallons of gasoline from the tanks. Michael R. Beevers, the primary person responsible for conducting the 1984 tests, testified that the test results indicated that the tanks and lines were not leaking, but that the fittings stemming from the top of the tanks were not tight. He testified that the loose fittings would not necessarily cause a leak unless the tank was over-filled so that the fuel rose above the top of the tank and escaped from the loose fittings (Beevers Depo., at 78–79, 112–115). Beevers testified that in his opinion the inventory shortage was significant enough to look into, but that he had not investigated it further at the time (Beevers, at 113).

On the other hand, there is also evidence tending to show that the tanks were not yet leaking at the time Thornton sold its interest in the station. Brenda Stackhouse, the Thornton employee in charge of overseeing the tanks and the person at Thornton who would have been notified if there was a leak in one of the tanks, testified that Thornton's inventory reconciliation records and line leak detectors had not indicated a leakage problem at the site (Stackhouse, at 40–45). There is also evidence indicating that inventory shortages and/or excesses are often caused by contraction or expansion of gasoline due to temperature variations. At any rate, Stackhouse testified that Kayo never notified her of any leakage problems at the Forsyth site as provided for in the Sale and Purchase Agreement.

Given the contradictory evidence in the record, the court finds the issue of whether the leak existed at the time Kayo purchased the site from Thornton in 1984 to be incapable of being resolved on summary judgment. It is clear, however, that the leak existed as of the 1989 tests conducted when Conoco closed the station and removed the USTs. In addition, plaintiff's expert, Mr. Groppe, testified that the plume resulting from the leak had stabilized and reached its maximum size

by June of 1992 (Groppe Dep. II, pp. 117–118, 132).

The second area of dispute concerns whether the leak has in fact caused damage to the motel site. On this point, Davis Bros. has presented evidence in the form of expert testimony from James H. Pritchett, a professional appraiser who conducted a study on behalf of Davis Bros. to estimate the approximate value of the property both before and after taking into account the effect of the contamination on the motel site's value. Mr. Pritchett's report estimates that the site would be worth $2,400,000.00 absent any contamination, a figure that supposedly represents the amount a neutral buyer would reasonably pay for the hotel property. From this figure, Pritchett deducted $600,000, the estimated cost of remediation, as well as an additional $150,000 contingency allowance to allow for cost overruns, a loss of $12,500 in lost hotel revenues during installation of the remediation system, and a final deduction of $273,200 for "additional risks and contingencies." (Pritchett Report, at 25–26). According to Pritchett, the estimated value of the hotel site after taking into account the contamination is $1,382,500, which would mean that the "damage" owed to Davis Bros. under this calculation would be $1,017,500.

The court finds this estimate to be without foundation. As an initial matter, it is worth noting that a full 41.6% of this "damage" estimate ($150,000 + $273,200) is attributable to what plaintiff's expert calls allowances for "contingencies." The fact that nearly two-fifths of the estimate consists of amounts assigned to take into account the estimator's guesstimates gives a good indication of the worth of the estimate.

But this fault pales in comparison to the real problem with plaintiff's argument for "damages." The entire calculation rests on the assumption that a potential buyer of the motel property would have to pay for the costs of remediation and the attendant loss of revenue. This is a false premise, as from the time the contamination was discovered Conoco has agreed to assume the entire cost of remediation and any attendant revenue loss due to installation of remediation equipment. Plaintiff's expert opined that the contamination has absolutely no effect on the motel's operations, and that motel guests are not even informed of the contamination (Pritchett Report, at 24). At the hearing, counsel for Davis Bros., Alfred B. Adams, III, admitted as much when he said, "We don't have any past damages. There are damages that are going to be incurred in the future in cleaning up this site." (Tr. of Hearing, at 115). In other words, by plaintiff's own admission, other than the costs of remediation—which Conoco has already agreed to assume—the contamination has absolutely no impact on the motel's operations or corresponding value.

Davis Bros. argued at the hearing that Conoco has taken too long to clean up the site, and Conoco's proposed method of remediation would not be adequate to completely remediate the site. For all the court can tell, this may in fact be true, but it still does nothing to prove that Davis Bros. has incurred damage. First, although it has been over nine years since the leakage was first discovered, the motel has been operating normally the entire time; the leakage has had absolutely no impact on the motel's income-generating ability. Second, the proper remediation method, and the time frame for it, are for the State of Georgia—not the court—to determine. Third, even if the State should make a mistake and allow Conoco to use an inadequate remediation method, the remaining contamination would still have no effect on the motel's operations or corresponding value. Fourth, any potential buyer of the motel site would not be saddled with the liability for cleanup costs or remediation, because Conoco has already agreed to do whatever it takes to satisfy the State. In short, the only effect the contamination could have on the property's value is the costs of remediation as determined by the State, and neither Davis Bros. nor any prospective buyer of the property could be liable for that.

Accordingly, the court finds that Davis Bros. has presented absolutely no credible evidence that it has been damaged in any way by the contamination of the motel site.

### III. Davis Bros.' Claims Against Thornton

When Davis Bros. settled its claims against Conoco, it assigned its claim against

Thornton to Conoco. Nevertheless, to avoid confusion the court will address the claims as if they are still held by Davis Bros.

Davis Bros. is suing Thornton under four separate theories: (1) nuisance; (2) trespass; (3) strict liability; and (4) for a violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6941, et seq. Having determined that the leak has not damaged the motel property, the nuisance, strict liability, and trespass claims are largely irrelevant to the issue of monetary recovery. However, because common law allows for nominal damages for many torts even where there has been no actual damage, *Kiel v. Johnson*, 179 Ga.App. 43, 345 S.E.2d 131, 133 (1986), the court will address each of the tort claims briefly.

The statute of limitations generally applicable to claims of property damage under Georgia law is four years. O.C.G.A. § 9-3-30. The tanks were removed in 1989, and, by plaintiff's own expert's testimony, the leak had reached its maximum size by June of 1992. The complaint was filed on August 20, 1996. Thus, the strict liability, nuisance and trespass claims are all barred by the applicable statute of limitations. Plaintiff's arguments that the continued existence of contamination constitutes a continuing trespass or nuisance, or that the statute of limitations was tolled until the leak was discovered, have both been flatly rejected by Georgia courts in similar contexts. *See Smith v. Branch*, 226 Ga.App. 626, 487 S.E.2d 35, 37–38 (1997) (holding that "The cause of action for causing a continuing nuisance is limited to situations where contamination continues to spread"); *Griffin v. Kangaroo, Inc.*, 208 Ga.App. 190, 430 S.E.2d 82, 84 (1993) (holding that the discovery rule for beginning the statute of limitations period does not apply to property damage); *see also Citizens & S. Trust Co. v. Phillips Petroleum Co.*, 192 Ga.App. 499, 385 S.E.2d 426 (1989).

Davis Bros.' strict liability claim also fails because the activity complained of—operating a gas station—is not ultrahazardous as long as it is not built and operated in an inappropriate location. *See, e.g., In re Tutu Wells Contamination Litigation*, 846 F.Supp. 1243, 1269–70 (D.V.I.1993) (holding the building of a service station above an aquifer supplying a community's water supply was inappropriate). Here, despite plaintiff's arguments to the contrary, there is no credible evidence that the station is in a location inappropriate for a gas station. On the contrary, the record shows that several other stations are located in the immediate vicinity. The fact that there is groundwater located in the vicinity does not, in the court's best judgment, create a genuine fact issue with regard to the station's location. Finally, it must be remembered that Davis Bros. leased the property to Kayo with full knowledge that the site would be used to operate a service station. For plaintiff to now claim that the site was inappropriate for the use intended is disingenuous at best.

Davis Bros.' fourth and final claim against Thornton is for both injunctive relief and damages under RCRA. RCRA provides for citizen suits against any person who is contributing or has contributed to the past or present transportation or disposal of any solid or hazardous waste "which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The remedies available when such endangerment is found have generally been held to include both abatement and injunctive relief, but not money damages. *See, e.g., 325–343 E. 56th Street Corp. v. Mobil Oil Corp.*, 906 F.Supp. 669, 684 (D.D.C.1995).

Here, plaintiff has presented no credible evidence supporting a finding of imminent and substantial endangerment to health or the environment. Nor does the fact that the state has ordered a cleanup of the area suffice to infer such endangerment. Moreover, the proposed remedy of injunctive relief is moot because Conoco has already agreed to remediate the site and pay for any costs associated with the cleanup, and the state is overseeing the cleanup more effectively than the court ever could. Thus, the RCRA claim fails on the merits, and is also moot.

## IV. Thornton's Cross–Claim Against Conoco

Because the court has determined Davis Bros.' claims to be without merit, the only

remaining issue with regard to Thornton's cross-claim is whether Conoco must reimburse Thornton for attorney's fees heretofore incurred in defending this lawsuit. This issue requires that the court construe the mutual indemnity clause of the 1984 Sale and Purchase Agreement in conjunction with the 1993 Settlement Agreement.

The first issue to be determined is whether the Settlement Agreement supersedes and/or negates the mutual indemnity provision of the Sale and Purchase Agreement. The court holds that it does not. The court finds that the sole effect of that agreement was to release Thornton from any claims available to Conoco arising out of the property. The agreement was silent with regard to claims brought by third parties against Thornton. Moreover, the agreement provides that the agreed to release shall not inure to the benefit of any party other than as specifically provided for—that is, other than to release Thornton from any claims that could be brought by Conoco. Finally, paragraph 7 of the agreement states that it supersedes all other agreements, but only "with respect to all such matters contained herein"—again, only with respect to Conoco's claims against Thornton. Given these rather precise limits to the agreement, and the fact that the entire agreement was entered into in contemplation of Conoco's claims against Thornton without consideration for claims of other third parties, the court finds that the Settlement Agreement did not negate the mutual indemnity provision contained in the 1984 Sale and Purchase Agreement.

This determination does not end the matter, however. The mutual indemnity clause in the Sale and Purchase Agreement has the effect of placing the entire burden of any litigation related to gas leakage on the party who was in possession of the service station property at the time the leakage occurred. Conoco must pay for Thornton's attorney's fees only if the leak occurred during Conoco's possession. If the leak occurred on Thornton's watch, then it alone must bear the cost of defending the suit.

This is precisely the issue that cannot be determined given the mixed evidence in the record. Because the court cannot say at this stage whether the leak occurred while Conoco was in possession, it cannot allocate the cost of defending the suit under the Sale and Purchase Agreement. Therefore, the court must find that a genuine issue of material fact exists on the issue of when the leak occurred, and until that issue is resolved by a jury, Thornton's cross-claim against Conoco must remain pending.

## V. Conclusion

Accordingly, having carefully considered the matter, Thornton's motion for summary judgment on all the claims filed against it by Davis Bros. and now held by Conoco is **GRANTED.** Thornton's motion for summary judgment on the cross-claim against Conoco for all expenses incurred in defending this litigation is **DENIED,** and Conoco's motion for summary judgment against Thornton is also **DENIED.** The motion to strike filed by Davis Bros. is **DENIED AS MOOT.** Conoco's motion to be substituted as a plaintiff is **DENIED,** as the court finds no compelling reason to change the parties' respective positions, and finds that doing so at this time would serve only to confuse the issues. See FED. R. CIV. P. 25(c).