NATIONAL TELEPHONE
COOPERATIVE ASSOCIATION,
Plaintiff,

v.

EXXON CORPORATION, Defendant.

No. Civ.A. 96–02504 (CKK).

United States District Court,
District of Columbia.

Nov. 19, 1998.

Donald B. Mitchell, James H. Hulme, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiff.

Cynthia J. Morris, Heather E. Grange, Washington, DC, for defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

In a five-count Complaint sounding in common-law negligence, trespass, nuisance, and strict liability, the Plaintiff National Telephone Cooperative Association ("NTCA") seeks compensatory and punitive damages from Defendant Exxon Corporation ("Exxon") for gasoline contamination that allegedly has migrated from Exxon's underground storage tanks to NTCA's adjacent property. Pending before the Court are Exxon's Motion for Summary Judgment, NTCA's Opposition thereto, and Exxon's Reply. After carefully reviewing the voluminous exhibits, deposition testimony, and controlling law, the Court grants in part and denies in part Exxon's motion. The Court enters judgment in favor of Exxon on Count II (strict liability), Count III (trespass), Count IV (private nuisance), and Count V (public nuisance). Furthermore, the Court enters judgment in favor of Exxon with respect to Count I's claim of negligent maintenance and operation. The Court, however, denies summary judgment with respect to Count I's negligent-

**4**

remediation claim. Moreover, the Court holds that NTCA may pursue its economic-damages claims without proof of physical harm to its property, and finds that there exist genuine issues of material fact that preclude summary judgment on NTCA's prayer for punitive damages.

## I. BACKGROUND

Although the parties have thoroughly chronicled all relevant events that span the past few decades, the salient facts necessary to resolve the pending Motion for Summary Judgment may be briefly summarized. Exxon and its predecessors have owned a gasoline service station at 2600 Pennsylvania Avenues, N.W. since the early 1920s. See Answer ¶ 10; Def.'s Motion for Summ.J. ("Def.'s MSJ") at Ex. 3 (Standard Oil Co., Plat of Service Station, May 1927). Since at least 1953, Exxon has warehoused its gasoline and other petroleum products in underground storage tanks ("USTs"). See Pl.'s Opp'n at Ex.3 (1953 permit to install tanks). Then in February 1971, Exxon installed five new steel USTs. See id. at Ex. 2 (building inspector report). Despite adding these new USTs, Exxon elected not to remove the tanks that it had installed in 1953. See id. at Ex. 6 (Dep. of Yeh at 107–09). In the years that have elapsed, Exxon's USTs have periodically suffered leaks that have released gasoline into the Exxon property. See id. at Ex. 7 (Dep. of Campbell at 144–46); Def.'s MSJ at 3–4 (admitting that its USTs leaked in 1985 and 1990).

NTCA's property is located adjacent to the Exxon station.[1] On March 13, 1990, NTCA's building manager, Theil "Butch" Jackson, witnessed, what an Exxon engineer later described as, "a black waste-oil like substance" leaking through the below-grade basement wall of the NTCA building that abuts the Exxon station. See Pl.'s' Opp'n at Ex. 11 (Dep. of Rhodes). When notified of this, Exxon dispatched a company with which it contracts, Handex of Ma-

ryland, Inc. ("Handex"), to assess the damage. See Def.'s MSJ at Ex.20 (Dep. of Otwell at 26); id. at Ex. 21 (letter from Handex to NTCA, Apr. 10, 1990). Exxon ultimately decided to repair the NTCA wall at its own cost. Between April 11 and April 16, 1990, Structural Preservation Systems repaired the wall. See Pl.'s Opp'n at Ex. 17 (Dep. of Kraus at Ex.4). On August 15, 1990, Handex employees "removed [the remaining] oil stain from adjacent building." Pl.'s Opp'n at Ex. 20 (Bates HAN 4523).

Approximately five years later, black material again began to leak through the NTCA wall. See Pl.'s Opp'n at Ex. 36 (Dep. of Jackson at 84–87). During this interim period, NTCA's building manager has testified that nothing "caused [him] to question whether or not the problem was repaired." Id. at Ex. 36 (Dep. of Jackson at 88).

Shortly before this incident, NTCA had decided to sell its building and retreat to the Virginia suburbs. See Pl.'s Opp'n at Ex. 18 (Dep. of Fairhead at 13). Despite overtures from several potential buyers, NTCA maintains that the gasoline that allegedly continues to migrate from the Exxon station onto its property has diminished its market value. Recently, however, the NTCA property was placed under contract to be sold for $6.6 million despite the present environmental problems. See Def.'s MSJ at Ex. 28 (purchase agreement, Aug. 13, 1998). This figure exceeds the value at which NTCA's own expert appraised the property in its uncontaminated state. See id. at Ex. 29 (Chaney & Associates' Limited Appraisal, Update Report, Aug. 24, 1998).

## II. DISCUSSION

### A. The Standard for Evaluating Motions for Summary Judgment.

A party is entitled to summary judgment if the pleadings, depositions, answers

---

1. Before NTCA took title to the land in 1975, a gasoline station called "Snappy Service Station" operated on the property that now houses the NTCA building. See Def.'s MSJ at Ex. 14 (telephone directories from 1956, 1960, 1973).

to interrogatories, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir. 1994). Although a court should draw all reasonable inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party's pleadings must evince the existence of a genuine issue of material fact. *See id.* at 247–48, 106 S.Ct. 2505. To be material the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party. *See id.; Laningham v. United States Navy*, 813 F.2d 1236, 1242–43 (D.C.Cir.1987). Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial. *See id.* at 248–49, 106 S.Ct. 2505. The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B. *NTCA's Claims Are Timely Pursuant to the Continuing–Tort Doctrine*

Exxon initially moves to dismiss NTCA's Complaint in its entirety based on the District of Columbia's statute of limitations. Although a plaintiff normally must bring suit within three years to recover damages for real-property injuries, *see* D.C.CODE § 12–301(3), District of Columbia law has enlarged the statute of limita-

tions to five years when toxic substances precipitate the injury, *see id.* § 12–301(10). Moreover, section 12–310(10) explicitly incorporates elements of the common-law discovery rule. Specifically, it provides that the action must be brought within "5 years from the date the injury is discovered or with reasonable diligence should have been discovered." *Id.*

Here, NTCA clearly recognized that Exxon's contaminated property had injured its own land in 1990 when its building manager first noticed a stain on the basement wall adjacent to the gasoline station. While not quibbling over this, NTCA argues that the venerable common-law continuing-tort theory insulates its Complaint from Exxon's summary-judgment motion. As this Circuit has conceptualized the doctrine's contours in the District of Columbia: "Under District of Columbia law, a plaintiff establishes a continuing tort by showing '(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period.' " *Whelan v. Abell*, 953 F.2d 663, 673 (D.C.Cir.1992) (quoting *DeKine v. District of Columbia*, 422 A.2d 981, 988 n. 16 (D.C. 1980)). Indeed, in *325–343 East 56th St. Corp. v. Mobil Oil Corp.*, 906 F.Supp. 669 (D.D.C.1995), a negligence and strict-liability action brought to recover damages for leaking USTs, this Court invoked the continuing-tort theory to find that the plaintiff's claims were not barred by the statute of limitations. *See id.* at 675. Here, NTCA's claims fall squarely within the ambit of the continuing-tort doctrine. First, NTCA's expert witness has indicated that gasoline that allegedly has saturated Exxon's property continues to migrate onto NTCA's property. *See* Pl.'s Opp'n at Ex. 7 (Dep. of Campbell at 519–22). Second, damages obviously flow "from the act as a whole rather than from each individual act" because migration of toxic contaminants is a fluid process incapable of hermetic division. Finally, there has been at

least one injurious act within the limitation period. Not only does the gasoline continue to migrate across the property line, but NTCA has produced evidence that Exxon did not remove its leaking USTs until November 1991. *See* Pl.'s Opp'n at Ex. 40 (Dep. of Yeh at Ex. 30).

While cognizant of the continuing-tort doctrine, Exxon maintains that D.C.CODE § 12–301(10) abrogates this well-recognized exception to the statute of limitations. As Exxon has framed the issue: "The question before this Court is one of first impression: whether the continuing tort doctrine is applicable to claims brought under Section 12–301(10)." Def.'s Reply at 8. According to Exxon, by specifically incorporating a portion of the discovery rule and extending the typical limitations period from three to five years, the D.C. legislature sought to vitiate the continuing-tort doctrine of any application to these types of damage actions. Based on subsection 10's unique formulation, Exxon distinguishes *East 56th St.* because there the court applied the continuing-tort doctrine under the general three-year provision of section 12–301(3).

■ Exxon's entreaty to abrogate the continuing-tort doctrine in certain toxic-tort actions fails because it is not manifestly clear that the legislature intended that precise result. In the District of Columbia, courts will not interpret statutes to derogate the common law unless the legislature expressly repeals or modifies the particular element of the common law. *See United States v. Jackson,* 528 A.2d 1211, 1215 (D.C.1987); *O'Connor v. United States,* 399 A.2d 21, 26 (D.C.1979). Moreover, Maryland law, "the source of the District's common law and an especially persuasive authority when the District's common law is silent," *Napoleon v. Heard,* 455 A.2d 901, 903 (D.C.1983), mandates that a legislature must expressly declare its intent to depart from well-recognized common-law principles:

It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.

*Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147, 1152 (Md.1994) (quoting *Lutz v. State,* 167 Md. 12, 172 A. 354, 356 (Md.1934)). Here, although section 12–301(10) affirmatively adopts a portion of the common-law's discovery rule, it is entirely silent with respect to the continuing-tort doctrine. Section 12–301(10) must evince language of greater clarity before the Court will interpret it to abrogate the continuing-tort doctrine by implication. Accordingly, NTCA's claims are timely presented.

### C. *Strict Liability*

NTCA purports to hold Exxon strictly liable for the damages that it has incurred. Arguing that neither the RESTATEMENT (SECOND) OF TORTS §§ 519–520 nor the case law that has developed around those provisions establishes a basis for strict liability, Exxon moves for judgment on this count of the Complaint. Although NTCA addresses the *Restatement* factors, it maintains that the ninety-one-year-old decision of *Brennan Construction Co. v. Cumberland,* 29 App.D.C. 554 (1907), controls.

The first issue to resolve is the extent to which *Brennan Construction* governs NTCA's strict-liability claim. In doing so, the Court is mindful that its subject-matter jurisdiction rests on diversity, 28 U.S.C. § 1332(a), and that the substantive law of the District of Columbia therefore applies. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Moreover,

[e]ven if, in the considered judgment of the federal court or that of the courts of other states, the rule of law that was announced by the forum state's highest court is anomalous, antiquated, or sim-

ply unwise, it must be followed by the federal court nonetheless, unless there are very persuasive grounds for believing that the state's highest court no longer would adhere to the previously announced principle.

CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 4507, at 141–47 (citations omitted). Of course, where a decision of the forum state's highest court is distinguishable, it may be instructive, but certainly not dispositive.

Without deciding the modern vitality of *Brennan Construction*, the Court concludes that it is easily distinguishable from the case at bar. There, the defendant "constructed, almost over the bed of the [Potomac River], two large tanks, and stored therein some 14,000 gallons of petroleum residuum, and permitted a considerable quantity to escape to the river, remain thereon for weeks, and injure innocent persons." *Brennan Constr.*, 29 App.D.C. at 561. The court held the defendant strictly liable when 1500 gallons of petroleum leaked from the storage tanks and floated downstream; ultimately damaging the plaintiff's boathouse and the boats housed in that structure.

Although the court applied the strict-liability rule that the English courts first articulated in *Fletcher v. Rylands*, L.R. 1 Exch. 265, it did not establish a universal rule from which one might infer that liability without fault will attach to anyone who stores petroleum products. Rather it carefully noted that its decision was made "[u]nder the circumstances of this case." *Brennan Constr.*, 29 App.D.C. at 561. By examining the factors that animated the court to apply strict liability, it is clear that the egregious facts of *Brennan Construction* distinguish that case from the one at bar. Not only did the defendant place the storage tanks within 200 feet of the "banks of a navigable stream, within the city limits, and in the vicinity of boathouses and docks," *id.*, "[i]t knew, or should have known, that if any considerable amount of the liquid substance it kept within its tanks escaped it surely would find its way to the [Potomac], and as surely interfere with the use and enjoyment of that river by the public. In other words, that it would obstruct traffic and constitute a nuisance." *Id.* Moreover, Congress "had ordained that no person should 'allow any tar, oil, ammoniacal liquor, or other waste products' to flow into or be deposited in the Potomac river within the District." *Id.* Finally, the court emphasized that strict liability was appropriate because there existed plenty of alternative locations in which the defendant's actions would not have presented so grave a risk of injury: "There is no evidence that it was at all necessary to locate this plant on the banks of the river, and common sense tells us that asphalt and petroleum residuum might have been successfully mixed in some other place where there would have been no danger of contaminating the Potomac, and impeding the traffic thereon." *Id.* at 561–62. Lest it remain unclear that the location of the defendant's operations justified the strict-liability rule, the court concluded: "Having deliberately elected to store such a large quantity of such a substance in a location where, if it escaped, the greatest amount of damage would ensue, the company must be charged with the absolute duty of keeping that substance within the limits of its own premises." *Id.* at 562.

By contrast to the reckless actions of the defendant in *Brennan Construction*, Exxon housed it gasoline products in storage tanks buried beneath the ground. The tanks are not located near any potable-water supply, nor are they situated in such a manner that they will likely wrought a public nuisance. Moreover, unlike the *Brennan Construction* defendant's ill-conforming use of its property, the USTs on Exxon's property rest within a commercial area of the city in which eleven other gasoline stations operate. Accordingly, based on the significant contextual differences between *Brennan Construction* and the case at bar, that 1907 decision does not

provide a basis upon which NTCA may hold Exxon strictly liable for operating USTs.

■ Turning to strict liability for abnormally dangerous activities under the RESTATEMENT (SECOND) OF TORTS §§ 519–20, the Court first observes that it is "a doctrine not yet explicitly adopted in the District of Columbia." *Delahanty v. Hinckley,* 564 A.2d 758, 760–61 (D.C.1989). Nevertheless, were the Court of Appeals for the District of Columbia to adopt the *Restatement*'s strict-liability formulation, it would likely follow the majority of jurisdictions that have held that a defendant does not engage in abnormally dangerous conduct by storing gasoline it USTs in commercial environments in which leaks are not likely to jeopardize human safety.

Section 519 of the *Restatement* sets forth the general principle upon which courts have held defendants liable regardless of fault: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." RESTATEMENT, *supra,* § 519(1). To determine whether a defendant's actions constitute "abnormally dangerous activities," the *Restatement* enumerates six factors for courts to consider:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* § 520.

Where USTs are buried beneath gasoline stations located in commercial settings, the overwhelming majority of courts have concluded that such conduct is not "abnormally dangerous." *See, e.g., Arlington Forest Assocs. v. Exxon Corp.,* 774 F.Supp. 387, 391 (E.D.Va.1991); *Hudson v. Peavey Oil Co.,* 279 Or. 3, 566 P.2d 175, 178 (Or.1977); *Smith v. Weaver,* 445 Pa.Super. 461, 665 A.2d 1215, 1219–20 (1995); *Walker Drug Co. v. La Sal Oil Co.,* 902 P.2d 1229, 1233 (Utah 1995); *Grube v. Daun,* 213 Wis.2d 533, 570 N.W.2d 851, 856–57 (1997). Unlike archetypical abnormally dangerous activities such as blasting, there is no evidence to suggest "that the risk of seepage [from USTs] cannot be eliminated by the exercise of reasonable care, or that the harm to be anticipated from the underground seepage of gasoline is 'grave.'" *Hudson,* 566 P.2d at 178; *see also Smith,* 665 A.2d at 1220 ("Gasoline and other petroleum products can be stored and dispensed safely with reasonable care...."); *Walker Drug Co.,* 902 P.2d at 1233 ("[W]e are not convinced that the risk cannot be eliminated by the exercise of reasonable care."); *Grube,* 570 N.W.2d at 857 ("Absent negligence or application of an outside force, use of a UST does not create a high degree of risk of harm to the person, land or chattels of another. Moreover those risks that do exist can be minimized by the exercise of reasonable care by the owner or possessor of the tank."). Perhaps because reasonable care will typically guard against any harm that USTs may inflict, "the storage of [gasoline] in tanks is a common use and is valuable to a modern society." *Smith,* 665 A.2d at 1220; *see also Walker Drug Co.,* 902 P.2d at 1233 ("[T]he operation of a gas station is common, appropriate, and of significant value to the community."); *Arlington Forest,* 774 F.Supp. at 391 (holding that gasoline stations fulfill essential transportation needs in modern society).

Nothing in *Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969), mandates a contrary result. There, the court held that it constituted an abnormally danger-

ous activity to place a UST next to residential property and virtually on top of a family's drinking-water well. *See id.* at 138. As the Maryland Court of Appeals has since emphasized, "[w]e stated that the most crucial factor in determining whether an activity was abnormally dangerous was the 'appropriateness of the activity' to the place in which it was carried on." *Rosenblatt v. Exxon Co.*, 335 Md. 58, 642 A.2d 180, 186 (1994) (citing *Yommer*, 257 A.2d at 138). Indeed, the *Yommer* court specifically held that because "the placing of a large underground gasoline tank in close proximity to the appellees' residence and well ... involve[d] such a risk," it was not a "matter of common usage." *Yommer*, 257 A.2d at 138. By contrast, Exxon's USTs were not situated in so precarious a position. As other courts have found, USTs located beneath the ground of gasoline stations located in commercial zones are commonplace and are of great utility to the community.[2] Accordingly, the Court shall enter judgment in favor of Exxon on Count II's strict-liability claim.

### D. *Negligence*

#### 1. *Negligent storage/operation of USTs*

■ Exxon moves for judgment on Count I's claim for negligent storage and operation of USTs because NTCA failed to designate an expert witness to establish the applicable standard of care. Although NTCA has designated an expert for its negligent-remediation claim, it does not dispute that it lacks an expert witness for this portion of its negligence claim. NTCA asserts, however, that it need not designate an expert witness in order to establish the standard of care for storing and operating USTs.

■ In the District of Columbia, "[t]he plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984)). To establish the standard of care, a plaintiff need not always present an expert witness. As the Court of Appeals for the District of Columbia has recently held:

> While expert testimony regarding the appropriate standard of care is not necessary for acts "within the realm of common knowledge and everyday experience," *District of Columbia v. White*, 442 A.2d 159, 164 (D.C.1982), "[a] plaintiff must put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average person." *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987) (citations omitted).

*Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C.1995). Cases in which the Court of Appeals has required the plaintiff to present expert testimony range from the peculiarly technical, *see, e.g., Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C.1998) (standard of care owed by the District to people held in its custody), to the relatively more common, *see, e.g., District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C.1984) (standard of care for

---

**2.** It also is worth noting that in a recent opinion, the Maryland Court of Appeals tacitly recognized the limited reach of *Yommer*. In *JBG/Twinbrook Metro Ltd. Partnership v. Wheeler*, 346 Md. 601, 697 A.2d 898 (Md. 1997), the appellant chose not to appeal the lower court's dismissal of its strict-liability claim based on a leaking UST. In a footnote, the Court of Appeals suggested why the appellants may have chosen to forgo that claim: "The south side of the Exxon station is very near the intersection of Rockville Pike and Twinbrook Parkway. There are gasoline service stations respectively on the northwest, southwest, and southeast corners of the intersection." *Id.* at 903 n. 6. The court concluded by comparing that factual scenario with the one presented in *Yommer*, where the defendant stored "large quantities of gasoline immediately adjacent to private residence." *Id.*

rendering an intersection safe with a crosswalk). Where, as in these cases, the question of whether the defendant conformed to the applicable standard of care was "not a subject withing the understanding of the average juror, 'expert testimony was essential.'" *Messina,* 663 A.2d at 538 (quoting *District of Columbia v. Moreno,* 647 A.2d 396, 399 (D.C.1994)).

The Court has little difficulty concluding that expert testimony is essential to establish the standard of care for NTCA's first negligence claim. Numerous technical issues that remain far "beyond the ken of the average layperson" abound in this case. Questions regarding the removal and installation of USTs, the materials from which they should be constructed to prevent leaks, how frequently they should be tested for leaks, and where they should be placed—not to mention the more fundamental issue of how they even operate— are "so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Peters,* 527 A.2d at 1273.

NTCA identifies two factors that it, somewhat incredibly, believes renders Exxon's putative negligence a "matter of common sense or everyday knowledge." Pl.'s Opp'n at 37. According to the plaintiff, "[t]hat Exxon deviated from the standard of care in installing and operating the USTs at its property is evidenced by its *admitted* failure to remove the old tanks and by its admitted contamination of NTCA's property." *Id.* Both factors underscore NTCA's misconception of the law of negligence. With respect to Exxon's failure to remove old tanks, NTCA assumes that it is within the ken of the average layperson to recognize when old

USTs should be removed. An expert witness is necessary to illuminate the frequency with which USTs should be replaced, and whether old USTs must invariably be removed whenever a gasoline station elects to install additional USTs. Such knowledge is too specialized and beyond the ken of the average layperson. With respect to Exxon's admitted contamination of NTCA's property, NTCA essentially transforms its negligence claim into one for strict liability. While all might agree that proper operation and use of USTs does not "typically" result in "massive contamination in and around the property on which the system is located," Pl.'s Opp'n at 37, it is an impermissible stretch to conclude that Exxon, *ipso facto,* was negligent. NTCA shoulders the burden of eliciting testimony from an expert witness on what measures actually constitute "proper operation and use" of USTs in order to permit the jury to determine whether Exxon, in fact, deviated from the governing standard of care.[3]

NTCA suggests that it should be permitted to present its negligence claim to the jury despite its failure to marshal expert testimony regarding the applicable standard of care because Exxon deviated from its own internal policy documents. Not only does NTCA neglect to cite any cases to support this argument, but the Court of Appeals for the District of Columbia has indicated that "when the standard of care turns on matters too technical for the average layperson, expert testimony [is] essential." *Moreno,* 647 A.2d at 399. Furthermore, as NTCA itself has noted, Exxon's "policy documents set down a standard of care unmet by its operations at

---

**3.** At times, NTCA flirts with a *res ipsa loquitur* theory to establish Exxon's negligence. Nevertheless, NTCA never uses the phrase *res ipsa loquitur* nor does it address the three elements necessary to establish *res ipsa* liability. "Before *res ipsa loquitur* can be held to apply to a happening or accident, however, a plaintiff must demonstrate that: (1) an event would not ordinarily occur in the absence of negligence; (2) the event was caused by an instrumentality in defendant's exclusive control; and (3) there was no voluntary action or contribution on plaintiff's part." *Bunn v. Urban Shelters Health Care Sys., Inc.,* 672 A.2d 1056, 1060 (D.C.1996) (citing *District of Columbia v. Billingsley,* 667 A.2d 837, 841 (D.C. 1995)). Accordingly, the Court does not address the potential applicability of *res ipsa loquitur* to this case.

the Exxon Property." Pl.'s Opp'n at 35. That Exxon failed to meet its own standard of care says nothing, without more, about whether Exxon met the *applicable* standard of care; for if Exxon's own standards exceeded the requirements of the general standard of care, a deviation from internal practice would not necessarily prove that Exxon was negligent.

Moreover, the Court of Appeals for the District of Columbia has held that although an employer's internal rules are admissible and offer "some indication of the care required under the circumstances," they are "not conclusive" evidence of the standard of care. *Garrison v. D.C. Transit Sys., Inc.,* 196 A.2d 924, 925 (D.C.1964). Recently, that court held that while the District's own internal guidelines "may well have been admissible as bearing on the standard of care . . . the admission of the [Plan] alone would not be sufficient to overcome a motion for directed verdict because expert testimony was still required to establish that the Plan, and more particularly that portion of it that was claimed to be violated . . . embodied the national standard of care and not a higher, more demanding one." *Clark v. District of Columbia,* 700 A.2d 235 (D.C.1997), *rehearing pending.* At bottom, because "these Rules, promulgated by the employer himself, are neither wholly definitive of the Common Law duty, nor are they of a dignity equal to that of a municipal ordinance," *Garrison,* 196 A.2d at 925, Exxon is entitled to judgment as a matter of law on NTCA's claim for negligent operation and use of USTs. Its inability to designate an expert witness to establish the standard of care on a matter of such scientific expertise is fatal. *See Messina,* 663 A.2d at 538.

### 2. Negligent Remediation

■ Unlike its other negligence claim, NTCA has designated an expert witness to testify about Exxon's allegedly negligent remediation. Kent Campbell, NTCA's expert, "is an environmental geologist who is an expert in investigating and remediating environmental contamination, especially from USTs." Pl.'s Opp'n at 3 n. 2. Exxon does not attack Campbell's credentials, but asserts that because he "admitted at his deposition that he had not considered the appropriate design of a system to sufficiently remediate the Exxon Property," NTCA cannot establish the standard of care for remediation. Def.'s MSJ at 25. Exxon's motion for judgment on this claim is unfounded. First, there is simply no requirement that the plaintiff's expert witness design a superior system to the one that the defendant employed. It is enough that the plaintiff's expert can identify the elements of a remediation system that render it reasonable. This NTCA has done. Campbell testified during his deposition that "Exxon should have employed some more aggressive form of ground water collection to ensure that they could get the hydraulic control that they desired. I don't have enough data and there haven't been engineering studies that are in the record to show me whether or not what [sic] technique would be most applicable for doing that." Pl.'s Opp'n at Ex. 7 (Dep. of Campbell at 522). Moreover, in July of 1995, Handex executed a pilot test that proved that the "soil vapor extraction" system ("SVE") could remove forty pounds of petroleum per day. *See* Pl.'s Opp'n at Ex. 30 (Letter from Kathleen M. Wehnes, Handex Senior Hydrologist to Melissa P. Otwell, Exxon Company, Sept. 11, 1995). Despite the seeming success of the SVE system, Exxon elected not to implement it despite the admission of its own in-house engineer that "there [was no] advantage to keeping the SVE system off-line while the other options [were] considered." Pl's Opp'n at Ex. 33 (Dep. of Otwell at 84). Whether Campbell convincingly establishes the applicable standard of care remains a question of fact for a jury to resolve. Accordingly, Exxon's motion for summary judgment as to NTCA's negligent-remediation claim shall be denied.

### E. Trespass

In the District of Columbia, trespass has been defined as "an invasion of the interest in the exclusive possession of land." *Carrigan v. Purkhiser*, 466 A.2d 1243, 1243 (D.C.1983). NTCA correctly identifies the principle of law that holds that " '[i]t is not necessary that one in making such an entry should have any unlawful intent.' " Pl.'s Opp'n at 38 (quoting *Nimetz v. Shell Oil Co.*, 74 F.Supp. 1, 2 (D.D.C.1947)). NTCA errs, however, when it jumps from the proposition that specific unlawful intent is not required to the conclusion that fault is irrelevant. As NTCA conceptualizes the tort of trespass, "[i]t does not matter that Exxon did not intend its gasoline to end up in NTCA's basement—it is enough that it did." Pl.'s Opp'n at 39. To sanction this novel interpretation of trespass would be to ignore the common-law dimensions of the tort.

While liability for trespass does not depend on a defendant's specific intent to invade unlawfully the property of another, "[w]hat is required, however, is volition, *i.e.*, a conscious intent to do the act that constitutes the entry upon someone else's real or personal property. An involuntary entry onto another's property is not a trespass." *Baltimore Gas and Elec. Co. v. Flippo*, 112 Md.App. 75, 684 A.2d 456, 461 (1996). As formulated in a well-known case: "While the trespasser, to be liable, need not intend or expect the damaging consequences of his intrusion, he must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he willfully does, or which he does so negligently as to

amount to willfulness." *Phillips v. Sun Oil Co.*, 307 N.Y. 328, 121 N.E.2d 249, 250–51 (N.Y.1954). It is not enough, as NTCA urges, that the defendant intentionally do some act that ultimately results in harm to property. This strict-liability formulation, while the law during Blackstone's era, has been abandoned in this country for years. *See* PROSSER & KEETON ON THE LAW OF TORTS 68–69 (5th ed.1984). Thus, in the *Nitro-Glycerine Case*, the Supreme Court refused to hold a carrier liable for trespass when the carrier's servants used a hammer to open a box that they did not know contained nitro-glycerine, only to have the box explode and injure property. *See Parrot v. Wells Fargo & Co.*, 82 U.S. (15 Wall.) 524, 21 L.Ed. 206 (1872). Under NTCA's formulation, the carrier would have been liable because its servants intended the act (striking the box with the hammer) that resulted in harm. Similarly, the Kentucky Supreme Court refused to hold a driver liable for trespass when his truck ran over a rock, which was then thrown by the wheels onto the land of the plaintiff. *See Randall v. Shelton*, 293 S.W.2d 559 (1956). There, although the driver certainly intended to drive the truck, there was no volitional act to have the wheels run over the rock and eject it onto the plaintiff's property.[4]

More recently, a Maryland court of appeals cited and discussed approvingly a Maryland district court decision that sets forth the modern conception of intent in trespass. *See Baltimore Gas and Elec. Co.*, 684 A.2d at 461 (citing and discussing *Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.*, 544 F.Supp.

---

4. Interestingly, NTCA's counsel rhetorically asks whether "[i]f, in the process of felling a tree on her property, my neighbor causes damages to my roof, is her liability dependent upon her specific intent to have the tree fall upon my roof or merely her general intent to cut the tree?" Pl.'s Opp'n at 39. The answer actually is neither, and without more information, a court would dismiss a complaint alleging only that the neighbor cut the tree. Presumably, NTCA's counsel harkens back to the

quaint case of *Newsom v. Anderson*, 24 N.C. (2 Ired.) 42 (1841), *cited in* PROSSER & KEETON, *supra*, at 68 n. 7, which held the tree-felling neighbor liable for trespass without regard for negligence. Yet as Professors Prosser and Keeton observe, "[t]he strict rule appears to have been repudiated in England, where it was born, and it is safe to say that it is almost at its last gasp in the United States." PROSSER & KEETON, *supra*, at 68.

1104 (D.Md.1982)). In *Nissan Motor Corp.*, an automobile company brought a trespass action against a shipbuilding company to recover for damages allegedly caused to its vehicles by smoke and paint emanating from the shipbuilding company's property adjacent to the automobile company's property. Although the shipbuilding company obviously intended the actions by which smoke and paint bellowed from its property, the court rejected the trespass claim. Adopting the language and reasoning of the district court, the Maryland appeals court quoted favorably: "[L]iability results from an intentional entry onto another's land regardless of harm.... No liability results from an unintentional non-negligent entry, even if harm is done." *Baltimore Gas and Elec. Co.*, 684 A.2d at 461.

As leading commentators have summarized, an intentional trespass occurs in "situations where the defendant intended to be where he was but did not intend the harmful consequences of his action. The point is that the defendant intended the intrusion." PROSSER & KEETON, *supra*, at 73. When conceptualized properly, it becomes clear that "one who innocently enters upon someone else's property without intending to trespass and under the mistaken belief that he or she is entitled or authorized to enter is nevertheless a trespasser." *Baltimore Gas and Elec. Co. v. Flippo*, 684 A.2d 456, 460 (1996), *aff'd*, 348 Md. 680, 705 A.2d 1144 (Md.1998). The defendant who innocently, but mistakenly, believes that he is walking over his own property is held liable for trespass because he volitionally and intentionally placed himself on the property. The touchstone of trespassory intent is a volitional action to be present on the property. It does not suffice merely to establish that the defendant acted in a manner that somehow resulted in an invasion of the plaintiff's property.

 Here, the act that Exxon volitionally intended was to place USTs beneath its property. That act did not result in a trespass. Moreover, with NTCA's claim for negligent storage and operation of USTs dismissed, *see supra* Subsection II. D.1, there is no basis to hold Exxon liable for negligent trespass; nor is there any indication in the record or the case law that contamination is "the immediate or inevitable consequence of" simply using USTs. *See Phillips*, 121 N.E.2d at 251. Accordingly, Exxon is entitled to judgment as a matter of law on Count III's claim for trespass.

## F. *Nuisance*

 NTCA's claims for public and private nuisance are the easiest to dispose of. The Court of Appeals for the District of Columbia has adopted the *Restatement*'s formulation of nuisance. "A public nuisance is an unreasonable interference with a right common to the general public." *B & W Management, Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 (D.C.1982) (quoting RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979)). Typically, "only governmental authorities or other representatives of the general public have standing to attack a public nuisance in court (absent statutory authorization)." *Id.* at 882. The lone exception to this general rule provides that "a private party may sustain an action to enjoin or recover damages for a public nuisance if that party can allege and prove 'special damages, distinct from that common to the public.'" *Id.* (quoting *Holloway v. Bristol–Myers Corp.*, 327 F.Supp. 17, 24 (D.D.C.1971), *aff'd*, 385 F.2d 986 (1967)). The contours of this exception, however, need not be examined because NTCA's public nuisance claims fail for a more fundamental reason: It has identified no public nuisance. The only interference that NTCA has alleged is diminution in the market value of its property. The record is bereft of any damage to property, damage to human health, or damage to anything remotely approximating a "right common to the general public." *Id.* at 881. NTCA's insular claim of market-value diminution touches upon no right common to

the general public. Accordingly, judgment shall be entered in Exxon's favor on Count V.

■■■■ In contrast to its public analog, "a private nuisance is a substantial and unreasonable interference with private use and enjoyment of one's land." *Id.* at 882 (quoting RESTATEMENT, *supra,* § 821D). Because the interference must impinge on the plaintiff's "use and enjoyment" of his land, private nuisance is proper when the defendant interferes with "the physical condition of the land, disturb[s] the comfort of its occupants, or threaten[s] future injury or disturbance." *Id.*

■■■■ Diminution of market value alone, buttressed by no accompanying personal or property damage, does not constitute an unreasonable interference with the "use and enjoyment" of the land. Interestingly, in a case upon which NTCA relies, *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986), *cert. denied,* 309 Md. 47, 522 A.2d 392 (Md.1987), the Maryland Court of Special Appeals explicitly adopted this well-recognized principle, though it did hold that physical impact on the plaintiff's property is not necessary to establish a cause of action for nuisance. *See id.* at 1004. It held that harm to property "should be construed broadly to include intangible tortious interferences of plaintiffs' use and enjoyment of their properties." *Id.* Thus, despite the absence of any physical impact, the plaintiffs were able to recover pure economic damages because the defendant's actions substantially interfered with their ability to use their property in a profitable manner. Despite this expansive view, however, the court carefully qualified its holding to exclude diminution of market value from its calculus: "We believe that our conclusion does not violate the established rule that the mere diminution of property value, absent such tortious interference, is not sufficient basis for recovery." *Id.* (citing *McCaw v. Harrison,* 259 S.W.2d 457, 458 (Ky.1953)); *Gray v. Southern Facilities,* 256 S.C. 558, 183 S.E.2d 438, 443 (S.C.

1971). Because NTCA claims damages only for diminution in market value, its private-nuisance claim must fail. Accordingly, judgment shall be entered in favor of Exxon on Count IV.

### G. *Economic Damages*

■■■ Exxon argues that economic damages are not recoverable in tort when unaccompanied by physical harm to property or persons. The great bulk of cases upon which Exxon relies, however, concern cases in which the parties' disputes arose out of a commercial transaction. *See Potomac Plaza Terraces, Inc. v. QSC Prods., Inc.,* 868 F.Supp. 346, 354 (D.D.C.1994); *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 634 A.2d 1330, 1332 (Md.1994). The economic-loss doctrine, however, is predicated on three considerations, none of which is present in the case at bar:

(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, and insure against the risk.

*Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis.2d 395, 573 N.W.2d 842, 846 (Wis.1998). As many courts have noted, the doctrine stems from an understanding that contract law and the law of warranty, in particular, are better suited than tort law for dealing with purely economic loss in the commercial arena. *See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 866–74, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Daanen & Janssen, Inc.,* 573 N.W.2d at 846; *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 151 (1965). To invoke the economic-loss doctrine in this case, however, will not vindicate any of the interests upon which the doctrine is based. Where the parties are privy to a commercial relationship, there is no inequity in

permitting them to use contract law to bargain over economic liability. Where, as here, however, the parties lack any commercial relationship, the plaintiff has no opportunity to bargain with the defendant over how to allocate risk and loss. Indeed, the essence of tort law is often that the plaintiff will rarely be able to predict when, how, to what degree, and at whose hands he will suffer damages. Especially because it is not clear whether District of Columbia courts even apply the economic-loss doctrine in commercial settings, *see Bowler v. Stewart-Warner Corp.,* 563 A.2d 344, 355 (D.C.1989) (Ferren, J., concurring), this Court refuses to extend the doctrine to the case at bar.

In its Reply brief, Exxon identifies several additional cases in which courts have barred claims of pure economic injury even in the absence of a commercial setting. *See In Re Wildewood Litig.,* 52 F.3d 499, 503 (4th cir.1995); *Satterfield v. J.M. Huber Corp.,* 888 F.Supp. 1567, 1572 (N.D.Ga. 1995); *Maddy v. Vulcan Materials Co.,* 737 F.Supp. 1528, 1540 (D.Kan.1990); *Mercer v. Rockwell Int'l Corp.,* 24 F.Supp.2d 735 (W.D.Ky.1998). These cases, too, are distinguishable. In each of these cases, the causes of action were either trespass or nuisance. In nuisance claims, as the Court already has observed, *see supra* Subsection II.F., diminution in market value by its very nature does not constitute an interference with a plaintiff's "use and enjoyment" of his land. It is, therefore, not at all surprising that courts have barred claims for pure economic injury under a nuisance theory.

The substantive law of trespass similarly underscores why simple diminution of market value will not suffice. A defendant is liable in trespass for any intentional invasion of the plaintiff's property. Under the common law, any invasion—regardless of how insignificant—constituted a trespass and entitled the plaintiff to nominal damages. *See* Prosser & Keeton, *supra,* at 70 ("Any physical entry upon the surface of the land is a trespass, whether the entry is a walking upon it, flooding it with water, casting objects upon it, or otherwise."). Courts pragmatically modified this common-law principle as an increasing number of trespass claims were brought based on invisible, microscopic invasions of toxins or contaminants. In response, the courts fashioned a rule that required a plaintiff to prove actual harm to the property in order to prevail on a claim for trespass based on invisible particulate deposits. Thus, the tort of trespass, when based on the invasion of gases or microscopic particles, has assumed similar dimensions of nuisance law by requiring an actual showing of harm or interference with land. *See Satterfield,* 888 F.Supp. at 1572 ("Diminished property value without evidence of physical harm is not considered 'actual or substantial damage' for trespass claims predicated on indirect invasions."); *Maddy,* 737 F.Supp. at 1540 ("Only if the indirect and intangible invasions causes substantial damage to the plaintiff's property, thereby infringing his exclusive possessory interest in the property, will an action for trespass lie."); *Mercer,* slip op. at 13 (noting and applying "the new rule that in cases involving an intentional trespass by imperceptible ... deposits there must be real and substantial harm to the property"). Indeed, Professors Prosser and Keeton have noted that "[t]hese [cases] are, in reality, examples of either the tort of private nuisance or liability for harm resulting from negligence." Prosser & Keeton, *supra,* at 72. Once a plaintiff must demonstrate real and substantial harm to his property to prevail on a claim for trespass, then, as with nuisance, it is understandable why courts have not considered diminution in market value to constitute the requisite harm.

The lone claim that has survived Exxon's Motion for Summary Judgment is Count I's negligent-remediation claim; NTCA has no pending cause of action for trespass or nuisance. *See supra* Subsections II.D.2; II.E; II.F. Negligence, unlike trespass or nuisance, boasts no inherent requirement that a plaintiff prove

actual physical harm. It is perhaps for this reason that the Maryland Court of Special Appeals has permitted plaintiffs to recover for purely economic injuries without physical impact under negligence. *See Yarema,* 516 A.2d at 1006 ("Case law in other jurisdictions also supports the proposition that plaintiffs may recover for economic injuries that defendant's pollution cause, even though there was no physical damage to plaintiff's property."); *see also Pruitt v. Allied Chem. Corp.,* 523 F.Supp. 975, 980 (E.D.Va.1981) (holding that owners of charter boats, marinas, and bait shops may recover damages for indirect economic harm caused by defendant's pollution of James River and Chesapeake Bay even though no plaintiff suffered any property damage); *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974) (holding that fishermen could recover lost profits from their commercial businesses which resulted from defendant's oil spill at sea without proof of injury to plaintiffs' person or property).

As already discussed in Subsection II. D.1, a person is liable to another in negligence only if it can be shown that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *See Powell v. District of Columbia,* 634 A.2d 403, 406 (D.C.1993). Exxon has never contested that it owed NTCA a duty of care in remediating the contamination, and the remaining issues, though contested, remain for a jury's deliberations. Yet,

> [w]oven into this overall consideration is also the question of reasonable foreseeable risk to be perceived by the actor at the time of the incident. Stated another way, we must ask "whether the injury to that individual [to whom a duty was owed] was reasonably foreseeable to the defendant."

*Haynesworth v. D.H. Stevens Co.,* 645 A.2d 1095, 1098 (D.C.1994) (quoting *Powell v. District of Columbia,* 602 A.2d 1123, 1133 (D.C.1992)). It is reasonably foresee-

able that a plaintiff's property may lose its market value if a defendant fails to exercise reasonable care in remediating environmental contamination that seeps through to the plaintiff's property. This, of course, does not mean that a plaintiff will be able to establish damages in every case of negligence. NTCA still must shoulder the burden of demonstrating that its property actually suffered a diminution in value—a task of no small proportion when one considers that NTCA has recently sold its property for an amount greater than even its own expert appraised the property in its uncontaminated state. *See* Def.'s MSJ at Ex. 29 (Chaney & Associates' Limited Appraisal, Update Report, Aug. 24, 1998). Accordingly, NTCA may pursue its claim for diminution in market value—to the extent that it can prove any—under a negligence theory.

G. *Punitive Damages*

 "The purpose of punitive damages is to punish a person for outrageous conduct which is wanton, reckless, or in willful disregard for another's rights." *United Mine Workers of Am. v. Moore,* 717 A.2d 332, 341 (D.C.1998). NTCA enumerates a number of factors, many of which are now irrelevant because of the dispositions in this Memorandum Opinion, that it believes entitles it to an award of punitive damages. Nonetheless, as the parties have framed the issue, the Court cannot at this point hold that NTCA is not, as a matter of law, entitled to exemplary damages. First, Exxon never responds to any of the allegedly aggravating factors that NTCA has identified in its Opposition brief. Instead, Exxon conclusorily asserts that NTCA has not met the extraordinary standard for awarding punitive damages. Yet NTCA does marshal certain facts that, unrebutted by Exxon, might permit a juror to infer that Exxon acted in "willful disregard for [NTCA's] rights." *Moore,* 717 A.2d at 341. Specifically, NTCA alleges that after it asserted its rights against Exxon, the latter elected not to reinstall the SVE-remediation system until there

was a "determination as to potential responsibility off-site," conceding that the "litigation outcome would affect our decision" on whether to continue with the SVE program. *See* Pl.'s Opp'n at 44; *id.* at Ex. 33 (Dep. of Otwell at 74, 125). Exxon made this decision despite recognizing that "there [was no] advantage to keeping the SVE system off-line while the other options [were] considered." *Id.* at Ex. 33 (Dep. of Otwell at 84). Without the aid of any response from Exxon, coupled with this Court's duty to construe the evidence "as favorably to [NTCA] as reason will permit," *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C.Cir.1998) (en banc), Exxon's Motion for Summary Judgment as to punitive damages shall be denied.

The Court pauses to indicate that the result might have been different had Exxon framed the issue slightly differently. In the District of Columbia, "proof by clear and convincing evidence must be shown in order to receive an award of punitive damages." *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 937 (D.C. 1995). Nowhere in its briefs does Exxon address the heightened proof required in this jurisdiction, and it would be improper for the Court, *sua sponte*, to resolve NTCA's entitlement to punitive damages based on an argument that counsel did not raise. At trial, the jury, of course, will be instructed that in order to award punitive damages to NTCA, it must find by *clear and convincing evidence* that Exxon's actions were "wanton, reckless, or in willful disregard for another's rights." *Moore*, 717 A.2d at 341; *Jonathan Woodner Co.*, 665 A.2d at 937.

## III. CONCLUSION

For the foregoing reasons, Exxon's Motion for Summary Judgment shall be granted in part and denied in part. Judgment shall be entered in favor of Exxon on Count II (strict liability), Count III (trespass), Count IV (private nuisance), and Count V (public nuisance). Moreover, judgment shall be entered in favor of Exxon on Count I's claim for negligent operation and use of USTs. Its motion shall be denied with respect to Count I's claim for negligent remediation and NTCA's entitlement to economic and punitive damages. An Order accompanies this Memorandum Opinion.

## ORDER

For the reasons expressed in the accompanying Memorandum Opinion, it is, this 18 day of November 1998, hereby

**ORDERED** that Defendant Exxon Corporation's Motion for Summary Judgment shall be, and hereby is, **GRANTED IN PART** and **DENIED IN PART;** and it is

**FURTHER ORDERED** that **JUDGMENT** shall be entered in favor of Defendant Exxon Corporation on Count I (negligent use and operation of underground storage tanks (USTs)), Count II (strict liability), Count III (trespass), Count IV (private nuisance), and Count V (public nuisance); and it is

**FURTHER ORDERED** that Defendant Exxon Corporation's Motion for Summary Judgment shall be, and hereby is, **DENIED** with respect to Count I (negligent remediation); and it is

**FURTHER ORDERED** that Defendant Exxon Corporation's Motion for Summary Judgment shall be, and hereby is, **DENIED** with respect to Plaintiff National Telephone Cooperative Association's claim for diminution-in-market-value damages and punitive damages.

**SO ORDERED.**